**UNITED STATES of America, Plaintiff,**

**v.**

**WEDZEB ENTERPRISES, INC.; William E. Daniels; Westinghouse Electric Corporation; General Electric Company; Doerr Electric Corporation; Sprague Electric Company; Crouse–Hinds Company; and Federal Signal Corporation, Defendants.**

**No. IP 90–1877 C.**

United States District Court,
S.D. Indiana,
Indianapolis Division.

Feb. 10, 1994.

---

Thomas P. Carroll, Environmental Enforcement Section, U.S. Dept. of Justice,

Washington, DC, Harold Bickham, Asst. U.S. Atty., Indianapolis, IN, Dorothy Attermeyer, Asst. Regional Counsel U.S.E.P.A., Region V, Chicago, IL, for plaintiff.

Warren D. Krebs, Parr, Richey, Obremskey & Morton, Michael R. Fruehwald, Sherry W. McGrath, Barnes & Thornburg, Indianapolis, IN, Jan Feldman, Joseph A. Strubbe, Pope & John, Ltd., Chicago, IL, Joseph B. Carney, John R. Schaibley III, Baker & Daniels, Indianapolis, IN, Kent M. Frandsen, Lebanon, IN, W.C. Blanton, Jodie L. Miner, Ice Miller Donadio & Ryan, Indianapolis, IN, Paul B. Galvani, Ropes & Gray, Boston, MA, James A. Knauer, Brian C. Bosma, William Bock, III, Kroger Gardis & Regas, Indianapolis, IN, for defendants.

## ENTRY

BARKER, Chief Judge.

The United States, on behalf of the Environmental Protection Agency ("EPA"), filed this action under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended by the Superfund Amendments and Reauthorization Act of 1986 ("CERCLA" or the "Act"), 42 U.S.C. § 9601 *et seq.*, to enforce an Administrative Order issued by the EPA pursuant to CERCLA Section 106, 42 U.S.C. § 9606. The Order directed Defendant Wedzeb Enterprises, Inc. ("Wedzeb") to perform removal activities at Wedzeb's Ballard Street property and surrounding contaminated locations (the "Site") in Lebanon, Indiana. EPA took that action to abate what it considered to be an imminent and substantial danger arising from the release of hazardous substances, particularly polychlorinated biphenyls ("PCBs"), at the Site, resulting from a fire which destroyed a warehouse there on or about May 2, 1981. The United States' Amended Complaint seeks recovery of past response costs and a declaratory judgment establishing the Defendants' liability for any future response costs that the United States incurs as a result of the releases and threatened releases of hazardous substances into the environment from the Site. *See* 42 U.S.C. § 9607(a).

Pursuant to the Court's March 22, 1991 Order of Bifurcation and First Case Management and Scheduling Order, this case is proceeding in three phases: liability (Phase I), costs (Phase II), and cross-claims for contribution or indemnity (Phase III). Accordingly, these findings of fact and conclusions of law do not address issues pertaining to response costs, contribution, or indemnity. Because the United States has settled its claims against Defendants Westinghouse, Federal Signal, Crouse–Hinds, Doerr, Wedzeb, USA Manufacturing, and Daniels, the only defendants remaining in Phase I are the General Electric Company ("GE") and Sprague Electric Company ("Sprague") (collectively "Defendants").

The Court conducted a bench trial in this matter on August 24–26, 1993. Having heard and considered the evidence, the Court hereby enters the following findings of fact and conclusions of law.

### FINDINGS OF FACT

*The Parties and Site*

1. Wedzeb Enterprises, Inc. is an Indiana corporation with its principal place of business located at 510 Indianapolis Avenue in Lebanon, Indiana.

2. Wedzeb owns the Ballard Street Warehouse ("Warehouse").

3. William E. Daniels ("Daniels") is an individual residing and doing business in the State of Indiana.

4. Daniels owned the Warehouse in May, 1981, and maintained that ownership until at least September 1985, when he conveyed it to Wedzeb.

5. Daniels is Wedzeb's proprietor and sole stockholder.

6. General Electric is a New York corporation with its principal place of business at Schenectady, New York.

7. Sprague is a Massachusetts corporation with its principal place of business in Stamford, Connecticut.

8. The Site is located near the center of Lebanon, Boone County, Indiana, approximately twenty miles northwest of Indianapo-

lis and covers approximately one-half acre. The street address is 320 Ballard Street. The Site includes Wedzeb's Ballard Street property and all land appurtenant thereto that was contaminated with hazardous substances released from the property.

9. Daniels purchased the Warehouse in February, 1981. It was a horseshoe-shaped, brick building with wooden floors.

*Wedzeb and its Operations*

10. Daniels formed Wedzeb in 1974 as a brokerage for surplus electrical components. Wedzeb purchased these components from the inventories of electrical equipment manufacturers at prices usually reduced below wholesale prices. It then sold the components to other manufacturers, distributors, and repair shops at prices below or competitive with prices of wholesale distributors. Wedzeb's marketing literature described its business as follows:

> We are specialists in the purchase of excess, idle or surplus inventories of air conditioning, heating, refrigeration and electrical component parts.... Specific commodities we always are looking to buy include: finished goods, electric motors, controls, dryers and tvx valves, capacitors, transformers, thermostats, relays, compressors, pipe fittings, copper and brass fittings, electrical fittings, wire and circuit breakers and related items.

Plaintiff's Exhibit 344.

11. Wedzeb's total sales volume rose from almost $350,000 in 1977 to over $900,000 in 1979, over $1.1 million in 1980, and over $1.6 million in 1981. *See* Plaintiff's Exhibits 362, 363, 364.

12. Among the electrical components that Wedzeb purchased and sold were capacitors, including capacitors containing PCBs.

13. Wedzeb ran regular advertisements in industry periodicals stating: "I BUY PCB Capacitors. I also sell capacitors. I have 500,000 capacitors in my inventory. Call me to get listing." Plaintiff's Exhibits 347 & 348.

14. Wedzeb distributed catalogs of components it had available for purchase, including numerous ratings of capacitors containing PCBs, to a mailing list of approximately ten to thirty thousand potential customers in 1978 and the years following. *See* Daniels, 8/24/93 at I–149. It is impossible to specify precisely the quantity of capacitors that Wedzeb sold because many of Wedzeb's records have been destroyed. Daniels' testimony and existing records indicate that Wedzeb sold thousands of PCB capacitors during 1977 to 1981, including sales to customers outside the United States. *See* Daniels, 8/24/93 at I–155, I–169–174. The volume of Wedzeb's sales of PCB capacitors demonstrates the existence of a substantial market for PCB capacitors between 1977 to 1982.

15. In or about April, 1981, Daniels directed his employees to move equipment from Wedzeb's warehouse on Walnut Street in Lebanon to the newly-acquired building on Ballard Street (*i.e.* the Warehouse). Among the equipment moved to the Warehouse were many thousands of capacitors, including PCB capacitors.

*Wedzeb's Commercial Transactions with GE and Sprague*

16. Prior to May 2, 1981, General Electric shipped PCB capacitors to Wedzeb from plants in Hudson Falls and Syracuse, New York. *See* Plaintiff's Exhibits 525, 108, 122, 336, 337 and 338.

17. Prior to May 2, 1981, Sprague shipped PCB capacitors to Wedzeb from its facilities in North Adams, Massachusetts. *See* Defendants' Exhibit 761; Plaintiff's Exhibits 103, 105, and 120.

18. In the late 1970s, GE decided to remove all of its PCB materials from its inventory after it appeared that the United States Government would soon regulate the storage, handling and sale of PCB materials. *See* Sorlin Depo., 5/12/92, at 78–79. GE subsequently made several sales of its surplus capacitors to Wedzeb at prices that were substantially below the usual discount for surplus parts. *See* Daniels, 8/24/93, at I–86, I–114.

19. Wedzeb was required to take the GE capacitors in an "as is" condition, without any warranties and with no right to return anything purchased. *See* Schwartz Depo., 4/2/92, at .37; Kimmet Depo., 4/10/92, at 63.

20. With all but one shipment from GE, Wedzeb typically received from fifteen to twenty-five percent more capacitors from GE than GE agreed to sell it. GE did not charge Wedzeb for these additional capacitors. *See* Daniels, 8/25/93, at II–13–14.

21. Sprague also sold its capacitors to Wedzeb in an "as is" condition with no right of return. *See* Cullen Depo., 5/11/92 at 40. Sprague expressly made no warranties to Wedzeb regarding the fitness or merchantability of the PCB capacitors. *See* Plaintiff's Exhibit 103. Daniels was required to purchase all of the capacitors in a particular lot or else forego the purchase. *See* Daniels, 8/24/93, at I–88. He was also required to purchase less marketable capacitors in order to continue purchasing the more popular models. *Id.* at 92.

22. Sprague sent Wedzeb free additional capacitors that Wedzeb was permitted to keep without charge. *See* Daniels, 8/24/93, at I–119.

23. At least ninety percent of the GE capacitors in Wedzeb's inventory were shipped directly from GE to Wedzeb. *See* Daniels, 8/24/93, at I–130. Daniels testified that the same proportion of Sprague capacitors in the Warehouse were shipped to Wedzeb by Sprague directly. *Id.*

24. In or about April, 1981, Daniels directed his employees to move inventory from Wedzeb's warehouse on Walnut Street in Lebanon to the newly-acquired building on Ballard Street (*i.e.* the Warehouse). Among the equipment moved to the Warehouse were more than 140,000 capacitors, including PCB laden capacitors that Wedzeb had received from the Defendants.

25. A Wedzeb employee prepared an inventory of the transferred materials which shows that the GE and Sprague capacitors were stored in the Warehouse. Reinhardt, 8/25/93, at II–64–65.

26. The PCB capacitors that Wedzeb purchased from GE and Sprague were new, useful products that were usable for their original intended purpose. They were functional, not broken or leaking, *see* Stipulations, ¶ 11, and were transferred to a reseller of such products and not discarded.

27. From 1979 to May, 1981, Wedzeb sold nearly 200,000 capacitors, including PCB capacitors. *See* Defendants' Exhibit 714; *see also* Daniels, 8/24/93 at I–168–177.

28. Wedzeb was successful in developing sales of its capacitors worldwide. *See* Daniels, 8/24/93 at I–133–134, 155.

29. The GE and Sprague capacitors were not delivered to Wedzeb to be dumped, and the capacitors in the Warehouse had not been deposited on the land or otherwise released into the environment before the fire. Wedzeb marketed and resold large quantities of capacitors to its customers. The capacitors were useful as demonstrated by the consumer demand for them.

*The Fire*

30. On or about May 2, 1981, a fire destroyed the Warehouse, releasing PCBs into the environment, creating an imminent and substantial danger to public health, welfare or the environment.

31. Prior to the fire, Wedzeb, stored equipment, including electrical capacitors, containing PCBs at the Warehouse.

32. At the time of the fire, the Warehouse contained capacitors that GE and Sprague had shipped to Wedzeb.

33. Following the fire, EPA determined that the fire debris at the Site presented an imminent and substantial danger to the public health, welfare or environment. EPA incurred response costs to clean up the Site.

34. Daniels owned the Warehouse both during and after the May 2, 1981 fire.

35. The cause of the fire is unknown. No evidence was presented showing that the Defendants "arranged for" the fire to occur.

36. A second warehouse at the Site was not destroyed by the fire. It was not used to house equipment containing PCBs.

*EPA's Response*

37. The Wedzeb Site was listed on the EPA's National Priorities List as a location that involved releases or threatened releases of hazardous substances into the environment.

38. On October 2, 1985, EPA sent Wedzeb an Administrative Order pursuant to § 106(a) of CERCLA directing Wedzeb to clean up the Site. *See* Region 5 On Scene Coordinator Report, Plaintiff's Exhibit 487, at p. 5.

39. Wedzeb did not conduct the clean-up action described in the Administrative Order.

40. The EPA conducted a clean-up at the Wedzeb Site and incurred costs for those actions.

41. On September 10, 1991, the EPA issued a final determination that all appropriate response actions had been taken at the Wedzeb Site and that no further response action was appropriate. The EPA then deleted the Site from the National Priorities List.

### Conclusions of Law

■ 1. The Court has jurisdiction over the subject matter of this action pursuant to §§ 106(a), 107(a), and 113(b) of CERCLA, 42 U.S.C. §§ 9606(a), 9607(a) and 9613(b), because the United States district courts have exclusive original jurisdiction over all controversies arising under CERCLA. The Court also has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1345, and 1355, because the action arises under the laws of the United States, the United States is the plaintiff in this action, and the action seeks the recovery or enforcement of penalties under an Act of Congress.

2. Under CERCLA, four classes of persons may be held liable for the release of hazardous substances into the environment:

(1) the owner and operator of a vessel or a facility,

(2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of,

(3) any person who by contract, agreement or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances, and

(4) any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities, incineration vessels or sites selected by such person, from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance.

. . . . .

42 U.S.C. § 9607(a).

■ 3. Liability under CERCLA is without regard to fault. *See U.S. v. Monsanto Co.,* 858 F.2d 160, 167 (4th Cir.1988), *cert. denied,* 490 U.S. 1106, 109 S.Ct. 3156, 104 L.Ed.2d 1019 (1989); *Levin Metals Corp. v. Parr–Richmond Terminal Co.,* 799 F.2d 1312, 1316 (9th Cir.1986); *New York v. Shore Realty Corp.,* 759 F.2d 1032, 1042 (2d Cir. 1985).

■ 4. For the Government to establish CERCLA liability as to the Defendants, it must show that: (1) the Defendants were persons within the meaning of the statute; (2) they owned or possessed hazardous substances; (3) by contract, agreement or otherwise, they arranged for the disposal or treatment of those wastes at a facility;[1] (4) a release or threatened release of a hazardous substance at the site occurred; and (5) response costs were incurred as a result of the release or threatened release. *See* 42 U.S.C. § 9607(a)(3); *see, e.g., C. Greene Equipment Corp. v. Electron Corp.,* 697 F.Supp. 983, 986 (N.D.Ill.1988).

5. The Act defines "person" as "an individual, firm corporation, association, partnership, consortium, joint venture, commercial entity. . . . or any interstate body." 42 U.S.C. § 9601(21).

6. The Defendants are "persons" within the meaning of CERCLA.

---

1. The United States has not contended that the Defendants arranged for the "treatment" of "hazardous substances" at Wedzeb or the Site.

The Government presented no evidence at trial on this point.

■ 7. PCBs, dioxins, and chlorinated furans are hazardous substances within the meaning of the Act. In defining the term "hazardous substance" in 42 U.S.C. § 9601(14), CERCLA incorporates by reference the substances designated as hazardous or toxic under the Clean Air Act, 42 U.S.C. § 7412, the Clean Water Act, 33 U.S.C. §§ 1317(a), 1321(b)(2)(A) (1982), the Resource Conservation and Recovery Act of 1976 ("RCRA"), 42 U.S.C. § 6921, and the Toxic Substances Control Act, 15 U.S.C. § 2606 (1982).

8. The Defendants owned or possessed hazardous substances.

9. The Act defines "release" as: "any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment (including the abandonment or discarding of barrels, containers, and other closed receptacles containing any hazardous substance or pollutant or contaminant)...." 42 U.S.C. § 9601(22).

10. There was a "release" or a "threatened" release of a "hazardous substance" from the Site.

11. "The terms 'respond' or 'response' means [sic] remove, removal, remedy, and remedial action;, all such terms (including the terms 'removal' and 'remedial action') include enforcement activities related thereto." 42 U.S.C. § 9601(25).

12. EPA incurred costs for the remedial actions it took at the Site.

13. Thus, the Defendants are "persons" within the meaning of CERCLA, they sold or gave capacitors which they owned and which contained PCBs, a hazardous substance, to Wedzeb, a release or threatened release of a hazardous substance occurred at the Site, and the Government had to incur response costs to clean it up. The only remaining issues, then, are whether the Defendants: (1) "arranged for" (2) "the disposal" of "hazardous substances" at a "facility" within the meaning of the Act.

14. The Act defines "facility" as:
(A) any building, structure, installation, equipment, pipe or pipeline (including any pipe into a sewer or publicly owned treatment works), well, pit pond, lagoon impoundment, ditch, landfill, storage container, motor vehicle, rolling stock, or aircraft, or (B) any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located; but does not include any consumer product in consumer use or any vessel.

42 U.S.C. § 9601(9).

15. The Site is a "facility" within the meaning of CERCLA § 107(a), 42 U.S.C. § 9607(a).

16. CERCLA adopts the definition of "disposal" used in the Solid Waste Disposal Act, 42 U.S.C. § 6903(3). *See* 42 U.S.C. § 9601(29). That Act provides that:

[t]he term disposal means the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on the land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters.

42 U.S.C. § 6903(3).

17. CERCLA also adopts the definition of "hazardous waste" used in the Solid Waste Disposal Act, 42 U.S.C. § 6903(5). *See* 42 U.S.C. § 9601(29). Again, that Act provides:

(5) The term "hazardous waste" means a solid waste, or combination of solid wastes, which because of its quantity, concentration, or physical, chemical, or infectious characteristics may—

(A) cause, or significantly contribute to an increase in mortality or an increase in serious irreversible, or incapacitating reversible, illness; or

(B) pose a substantial present or potential hazard to human health or the environment when improperly treated, stored, transported, or disposed of, or otherwise managed.

42 U.S.C. § 6903(5).

18. The Solid Waste Disposal Act, defines "solid waste" as:

(27) The term "solid waste" means any garbage, refuse, sludge from a waste treatment plant, water supply treatment plant, or air pollution control facility and other discarded material, including solid, liquid, semisolid, or contained gaseous material resulting from industrial, commercial, mining, and agricultural operations, and from community activities, but does not include solid or dissolved material in domestic sewage, or solid or dissolved materials in irrigation return flows or industrial discharges which are point sources subject to permits under section 1342 of Title 33, or source, special nuclear, or byproduct material as defined by the Atomic Energy Act of 1954, as amended (68 Stat. 923) [42 U.S.C.A. § 2011 et seq.].

42 U.S.C. § 6903(27).

19. "Garbage" is a "refuse of any kind." *Webster's Third New International Dictionary, Unabridged,* at 935. "Refuse" is "the worthless or useless part of something." Id. at 1910.

20. Consequently, before a transaction can be classified as a "disposal" under § 9607(a)(3), the material exchanged must be a "solid waste" or "hazardous waste". *See* § 6903(3). A substance is a "hazardous waste" if it is a "solid waste", *see* § 6903(5), which includes "garbage" and "refuse". *See* § 6903(27); *see also 3550 Stevens Creek Ass'n v. Barclays Bank,* 915 F.2d 1355, 1361–62 (9th Cir.1990), *cert. denied,* 500 U.S. 917, 111 S.Ct. 2014, 114 L.Ed.2d 101 (1991).

21. GE's and Sprague's CERCLA liability depends in part upon whether their sales to Wedzeb of capacitors containing PCBs, a "hazardous substance", were transactions involving the *"disposal"* of "solid waste" or "hazardous waste". *See* 42 U.S.C. § 6903(3). Because of CERCLA's strict liability scheme, the Defendants' characterizations of their arrangements with Wedzeb or beliefs about the nature of the capacitors do not settle the matter. The Court must examine the underlying facts and circumstances surrounding the particular transactions at issue to determine whether they amounted to a "disposal" of the capacitors. *See Dayton Independent*

*School District v. U.S. Mineral Products Co.,* 906 F.2d 1059, 1065 (5th Cir.1990).

22. The Defendants urge the Court to find that the capacitors were not waste merely because they were unused and functional at the time of sale. The problem with this approach is that it excludes from the definition of "hazardous waste" those products which are worthless even though they are still capable of being used as manufactured. "Functionality" and "worth" are distinct notions, however. For example, a preserved cylinder block for an Edsel car may still be functional as a cylinder block in an Edsel but completely worthless because Edsels are extinct. As the definitions cited above make clear, it is the worthlessness of an object that makes it "refuse" or "garbage", which is a required characteristic of "hazardous waste". Consistent with § 9607(a)(3), that assessment is made at the time of sale or transfer of the product by the generator (*i.e.* the entity that "arrang[es] for disposal" of the waste). While normally the fact that the materials were sold by the generator indicates that they have value, in this case the evidence indicates that the Defendants shipped unsolicited capacitors to Wedzeb without charge. The record is unclear regarding which individual capacitors Wedzeb paid for and which were overage.

23. Besides delivering unsolicited capacitors, the Government argues that the discounts that the Defendants gave Wedzeb on its capacitor sales indicate that "the transfers to Wedzeb were not bona fide sales of useful products but, instead, were a means for those Defendants to rid themselves of materials that represented a substantial, potential liability." Government's Conclusions at ¶ 16. The contention that the capacitors in Wedzeb's possession were worthless is difficult to reconcile with the volume of capacitor sales that Wedzeb later made, however. *See* Defendants' Exhibit 714. That the Defendants had no use for the capacitors and were willing to part with them for next to nothing in order to avoid holding costs does not alone establish their worth.[2] CERCLA

---

**2.** Consider for example the case of two busy "yuppies" who marry and live in a small apart-

ment in New York City. After moving into their cramped quarters, they discover that they both

requires the Court to take an objective look at the capacitors and determine whether they meet the statutory definition of "hazardous waste" and whether the Defendants "disposed" of them. While there may be other ways of determining whether something has value and is not waste, this Court is satisfied that the marketplace provides a reasonable, objective gauge of product worth. Selling a useful, marketable product that is not destined to enter the environment, as for example through application, dumping, or spilling on the land, *etc.*, does not constitute "disposal" under the Act. *See Dayton School District*, 906 F.2d at 1065. By definition, such a useful, marketable product is not waste under the Act. The evidence in this case indicates that the consumer demand for Wedzeb's capacitors was sufficient to lift them out of any classification as "waste" or "refuse".

24. The capacitors that the Defendants delivered to Wedzeb were not "hazardous waste", *see* 42 U.S.C. § 9601(29), and the Defendants did not make a "disposal" of them. *See* 42 U.S.C. § 6903(3).

25. The factual record is incomplete as concerns whether Wedzeb purchased particular models or brands of capacitor from the Defendants for which there was no consumer demand or, by some other measure, which could be classified as "hazardous waste". The Government, for example, notes the difficulty that Wedzeb had in selling its non-HVAC capacitors. *See* Government's Findings, at ¶ 27. But even with this variety of capacitor, Wedzeb was able to sell between a third and half of them by 1981. *See* Daniels, 8/24/93, at I–114. That Wedzeb was unable

to sell certain models of capacitor does not warrant the generalization that no market existed for them or that they were worthless. If there is a way to segregate the truly useless capacitors from the useful ones, the record before the Court does not indicate how this may be accomplished. As already noted, the parties have stipulated that all of the capacitors at issue were not broken or leaking, *supra.*

26. The facts in this matter are readily distinguishable from other cases where the courts have found a "disposal" even though the material or product sold was still characterized as "useful". In *States v. BFG Electroplating and Manufacturing Co.*, 31 Env't Rep.Cas. 1183 (BNA), 1990 WL 67983 (W.D.Pa. February 2, 1990), the court held that BFG's sale of contaminated cinder blocks amounted to a disposal despite its finding that the blocks were still useful for construction. There, however, the parties had agreed at the time of the transaction that the blocks were to be disposed of at an approved disposal facility. *See id.* at 1185, 1990 WL 67983 at *2 ("We find that since the cinder blocks were to be disposed of at a facility, the sale was clearly 'an arrangement for disposal' as defined under § 107(a)(3) of CERCLA notwithstanding that the blocks were a useful substance for construction."). Furthermore, the court's finding that the blocks were "useful" is suspect given that they were contaminated. The PCB capacitors at issue here were unaltered. Nor is this case similar to *State of New York v. General Electric Co.*, 592 F.Supp. 291 (N.D.N.Y.1984), where the court ruled that GE had disposed of oil containing PCBs

have brought to the marriage various new household items that the other possesses. They now have two cappuccino makers, two electric pencil sharpeners, and two exercise bicycles which, due to lack of storage space, they have to keep in their living room. Because they are so busy, she is a lawyer and he is a business consultant, they decide that rather than waste their precious time trying to sell the items for what they are worth, they will get rid of them by donating them to Goodwill or the Salvation Army. After all, they have no use for the second sets even though they are perfectly functional products. Does the fact that these particular "yuppies" have no need for the second cappuccino maker, pencil sharpener, or bicycle and that they dumped these items mean that they are garbage? Of course not.

In contrast, consider then the case of two bona fide "hippies" who move into the same apartment. They discover that each party has brought to the marriage an oversupply (*i.e.* more than zero) of lava lamps that function every bit as well as they did in 1967. They too decide to part company with these possessions. Like the cinder block for the Edsel, *supra*, can anyone seriously be heard to say that the lamps are not garbage, assuming (probably unjustifiably) that not a single person in the world has retained any fascination, let alone use, for gyrating lard in an illuminated container of colored oil? The lamps still function but that fact is totally incidental to their junk-like nature.

when it sold the oil to a drag strip for use to control dust. In that instance, GE had either the knowledge or imputed knowledge that the oil was going to be deposited on the land surrounding the dragstrip. *Id.* at 297; *see also U.S. v. Conservation Chemical Co.,* 619 F.Supp. 162, 237–41 (W.D.Mo.1985). No evidence was presented in this matter indicating that the capacitors were destined for such an application directly on the land.

■ 27. Additionally, even if CERCLA's definition of "disposal" did not require a transaction in "waste", the transactions of GE and Sprague with Wedzeb are not within the scope of § 9607(a)(3) because the event that caused the release of the PCBs into the environment was not a "disposal" at the Site that the Defendants "arranged for" but an unanticipated fire.[3] No evidence was presented showing that the fire and ensuing release was "arranged for" by anyone, including GE and Sprague. *See Amcast Industrial Corp. v. Detrex Corp.,* 2 F.3d 746,

751 (7th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 691, 126 L.Ed.2d 658 (1994).[4]

28. GE and Sprague are not liable under section 107(a) of CERCLA, 42 U.S.C. § 9607(a), for response costs incurred at the Site.

29. Because the Court has determined that the Defendants are not liable under the Act, it need not reach the issue whether the Defendants may avoid liability under the affirmative defenses found in 42 U.S.C. § 9607(b).

The Plaintiff's Motion to Supplement the Record and for Reconsideration of Ruling Concerning Testimony of Plaintiff's Expert Witness Filmore Weinstein is denied. While Mr. Weinstein would qualify as an expert as concerns the demand of the Harry Alter Company for particular kinds of capacitors, he lacked the scientific, technical or other specialized knowledge to testify about the general marketability of surplus capacitors, either domestically or abroad.[5] An addition-

---

3. It was only at trial that the parties stipulated that none of the capacitors that GE or Sprague delivered to Wedzeb were broken or leaking.

4. In *Amcast,* the Seventh Circuit held that a chemical manufacturer could not be held liable under § 9607(a)(3) for a spill caused by the transporter of the chemical because the manufacturer had not "arranged for" the spill. The court explained:

   Although [CERCLA] defines disposal to include spilling, the critical words for present purposes are "arranged for." The words imply intentional action. The only thing that Detrex [the manufacturer of the chemical] arranged for Transport Services to do was to deliver TCE to Elkhart's storage tanks. It did not arrange for spilling the stuff on the ground. No one arranges for an accident, except in the sinister sense, not involved here, of "staging" an accident—that is, causing deliberate harm but making it seem accidental....
   In the context of the operator of a hazardous-waste dump, "disposal" includes accidental spillage; in the context of the shipper who is arranging for transportation of a product, "disposal" excludes accidental spillage because you do not arrange for an accident except in the Æsopian sense illustrated by the staged accident.
   The words "arranged with a transporter for transport for disposal or treatment" appear to contemplate a case in which a person or institution that wants to get rid of its hazardous wastes hires a transportation company to carry them to a disposal site. If the wastes spill en route, then since spillage is disposal and the shipper had

arranged for disposal—though not in that form—the shipper is a responsible person and is therefore liable for clean-up costs. But when the shipper is not trying to arrange for the disposal of hazardous wastes, but is arranging for the delivery of a useful product, he is not a responsible person within the meaning of the statute and if a mishap occurs en route his liability is governed by other legal doctrines.
   2 F.3d at 751.

5. Mr. Weinstein testified as follows:

   Q Did your customers for surplus items ever tell you about their investigations of surplus deals from other companies?
   A No.
   Q Do you have any basis for comparing Harry Alter's surplus transactions in the same time period, the late 70's, to other surplus dealers in the industry?
   A No.
   Q You have no basis at all, sir?
   A If I understood the question, you asked me if I had any means of knowing what my other surplus buyers or sellers were doing. Was that the question, Mr. Carroll?
   Q The question was, do you have a basis for comparing Harry Alter's surplus transactions to your competitors in the surplus business in that late 70's time frame? Do you have any basis at all for comparing what you were doing to what other companies in the industry—
   A Never compared them.
   Q Do you have knowledge on the basis of which you could do that comparison now?

al offer of proof at this time would be cumulative and untimely. As the Government notes, it "apprised the Court of the substance of the evidence that the United States sought to admit at the time the Court made its decision to exclude such evidence." United States' Reply Memorandum in Support of Motion to Supplement the Record, at 4.

## CONCLUSION

The Defendants GE & Sprague are not liable under CERCLA for response costs at the Site because they did not "arrange for the disposal" of the capacitors in question.

It is so ORDERED.

A  Yes.  Some knowledge.
Q  What knowledge do you have?
A  As I mentioned before, the fliers that would come back to me as copies, or copies of mimeographed lists that various surplus dealers were offering such an item at such a price.  And this mainly came to me from the New York area.

See Weinstein, 8/25/93, at 151–52. Mr. Weinstein's knowledge about the market for surplus capacitors was not comprehensive.  "Some knowledge" an expert does not make.