**SACO STEEL COMPANY, Plaintiff,**

v.

**SACO DEFENSE, INC., Defendant and Third–Party Plaintiff,**

v.

**Michael A. ZAITLIN, et al., Third–Party Defendants**

**and**

**HEIDELBERG NORTH AMERICA, INC., Third–Party Defendant and Fourth–Party Plaintiff,**

v.

**HILL–LOMA, INC., Fourth–Party Defendant.**

Civil No. 94–311–P–C.

United States District Court, D. Maine.

Dec. 21, 1995.

---

David J. Perkins, Perkins & Perkins, Portland, Maine, for Plaintiff Saco Steel Company, Michael A. Zaitlin, et al., Third–Party Defendants.

Mark L. Haley, Constance P. O'Neil, Laura O'Hanlon, Conley, Haley & O'Neil, Bath, Maine, for Saco Defense Inc., Defendant & Third–Party Plaintiff.

Harold J. Friedman, Martha C. Gaythwaite, Friedman & Babcock, Portland, Maine, for Heidelberg North America Inc., Third Party Defendant and Fourth–Party Plaintiff.

John M.R. Patterson, David Soley, Glenn Israel, Bernstein, Shur, Sawyer & Nelson, Portland, Maine, for Hill–Loma, Inc.

### MEMORANDUM AND ORDER GRANTING IN PART, AND DENYING IN PART, DEFENDANT SACO DEFENSE'S MOTION FOR SUMMARY JUDGMENT

GENE CARTER, Chief Judge.

Plaintiff Saco Steel Company, provider of scrap metal removal and processing services, brings this action against Defendant Saco Defense, Inc., manufacturer of weapons, for:

negligent misrepresentation under Maine law (Count I); strict liability under the common law of Maine and the Maine Hazardous Waste and Waste Oil Statute, 38 M.R.S.A. § 1319–U(5) (Count II); public and private nuisance under Maine law, 17 M.R.S.A. § 2701 (Count III); wrongful involvement in litigation under Maine law (Count IV); contractual indemnification under Maine law (Count V); contribution under the common law of Maine (Count VI); disallowance of Defendant's bankruptcy claim (Count VII); wrongful and intentional nondisclosure under Maine law (Count VIII); response cost recovery under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9601 *et seq.* (Count IX); tortious interference with contractual relationships under Maine law (Count X); and negligence under Maine law (Count XI). *See* Plaintiff Saco Steel's Seventh Amended Complaint (Docket No. 57) (the "Complaint").

This order addresses Saco Defense's Motion for Partial Summary Judgment (Docket No. 80) on Counts II, III, IV, V, IX, and X.[1] For the following reasons, this Court will grant Defendant's motion as to Counts III and IV of the Complaint, will deny it as to Counts II, V, and IX, and will grant Plaintiff's motion to dismiss, without prejudice, Count X.

### I. STANDARD FOR SUMMARY JUDGMENT

The Court of Appeals for the First Circuit has recently explained once again the workings and purposes of the summary judgment procedure:

Summary judgment has a special niche in civil litigation. Its "role is to pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required." *Wynne v.*

---

1. Much of the factual and legal discussion herein also pertains to the three other summary judgment motions currently pending in this case. Michael A. Zaitlin, Harry Zaitlin and David A. Zaitlin, all present or former officers of Saco Steel, seek partial summary judgment against Saco Defense, who has joined them as Third–Party Defendants. Docket No. 73. Still other Third–Party Defendants, United Technologies Corporation, Heidelberg North America, Inc.,

Parker–Hannifin Corporation, and Aerospace Metals, Inc., also seek summary judgment against Saco Defense. Docket Nos. 82, 95. One of those Third–Party Defendants, Heidelberg North America, has, in turn, joined a Fourth–Party Defendant, Hill–Loma, who seeks summary judgment as well. Docket No. 78. This Court will dispose of each of those motions in separate orders.

*Tufts Univ. Sch. of Med.,* 976 F.2d 791, 794 (1st Cir.1992), *cert. denied* —— U.S. ——, 113 S.Ct. 1845, 113 S.Ct. 1845 (1993). The device allows courts and litigants to avoid full-blown trials in unwinnable cases, thus conserving the parties' time and money, and permitting courts to husband scarce judicial resources.

A court may grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c)....

Once a properly documented motion has engaged the gears of Rule 56, the party to whom the motion is directed can shut down the machinery only by showing that a trialworthy issue exists. *See National Amusements [v. Town of Dedham],* 43 F.3d [731,] 735 [ (1st Cir.1995) ]. As to issues on which the summary judgment target bears the ultimate burden of proof, she cannot rely on an absence of competent evidence, but must affirmatively point to specific facts that demonstrate the existence of an authentic dispute. *See Garside [v. Osco Drug, Inc.],* 895 F.2d [46,] 48 [ (1st. Cir. 1990) ]. Not every factual dispute is sufficient to thwart summary judgment; the contested fact must be "material" and the dispute over it must be "genuine." In this regard, "material" means that a contested fact has the potential to change the outcome of the suit under the governing law if the dispute over it is resolved favorably to the nonmovant. *See [United States v.] One Parcel [of Real Property with Buildings],* 960 F.2d [200,] 204 [ (1st Cir.1992) ]. By like token, "genuine" means that "the evidence about the fact is such that a reasonable jury could resolve the point in favor of the nonmoving party...." *Id.*

When all is said and done, the trial court must "view the entire record in the light most hospitable to the party opposing summary judgment, indulging all reasonable inferences in that party's favor," *Griggs– Ryan [v. Smith],* 904 F.2d [112,] 115 [ (1st

Cir.1990) ], but paying no heed to "conclusory allegations, improbable inferences, [or] unsupported speculation," *Medina– Munoz [v. R.J. Reynolds Tobacco Co.],* 896 F.2d [5,] 8 [ (1st Cir.1990) ]. If no genuine issue of material fact emerges, then the motion for summary judgment may be granted.

... [T]he summary judgment standard requires the trial court to make an essentially legal determination rather than to engage in differential factfinding....

*McCarthy v. Northwest Airlines, Inc.,* 56 F.3d 313, 314–15 (1st Cir.1995).

## II. MATERIAL FACTS

From approximately 1960 through September 1993, Saco Steel provided scrap removal and processing services to Saco Defense. Complaint ¶ 5; Saco Defense's Answer to Seventh Amended Complaint ¶ 5 (the "Answer"). In the course of their relationship, Saco Steel paid Saco Defense for certain steel products that could be recycled and sold, and Saco Defense paid Saco Steel for removing and transporting those products from Saco Defense's nearby facility. Complaint ¶ 5; Answer ¶ 5. Among the materials Saco Defense sold to, and had removed by, Saco Steel were steel turnings and cuttings[2] resulting from the manufacture of gun barrels. Deposition of Kenneth Lambert, August 9, 1994, at 13–15 ("Lambert I").

To control the heat generated in this manufacturing process, Saco Defense used certain coolants and cutting fluids. Lambert I at 15. Saco Defense maintained at its facility both an "oil room" for draining those liquids from the steel turnings and cuttings and a centrifuge for drying the cuttings. Lambert I at 26, 34–35, 41; Deposition of Richard Bolduc, February 27, 1995, at 13, 24–25 ("Bolduc"). Richard Bolduc, supervisor of Saco Defense's oil room, has testified that Saco Defense employees routinely: (1) failed to empty the catch pan containing oil and other liquids frequently enough to allow the draining process to continue (Bolduc at 17–

**2.** "Cuttings" are referred to elsewhere in the record as "chips." *See* Lambert I at 37–39.

19); and (2) deposited wastes and sludge[3] generated by the Saco Defense manufacturing process into the containers holding the turnings and cuttings to be sent to Saco Steel (Bolduc at 32–33, 50–51). Bolduc also testified that he was instructed to move turnings and cuttings out of the oil room even if they remained wet, and that only about twenty percent of cuttings were put through the centrifuge between the mid–1970s and 1980. Bolduc at 20, 25.

Saco Steel complained to Saco Defense on several occasions when incoming turnings and cuttings contained a discernible flow of oil and other liquids. Bolduc at 16–17, Deposition of Jonathan David Brawn, August 9, 1994, at 38–39. Saco Defense responded to these complaints by representing that future loads of turnings and cuttings would have no discernible flow. Deposition of Michael A. Zaitlin, August 11, 1994, at 78–80 ("M. Zaitlin I"); Lambert I Ex. P–8. Also, when Saco Steel accepted materials from Saco Defense, Saco Defense accepted, and one of its managers signed, invoices from Saco Steel warranting that the materials did not contain "hazardous subtances."[4] Lambert I at 71–72.

Beginning in approximately 1979, Saco Steel stored the turnings and cuttings it received from Saco Defense in a concrete pit designed to drain liquids from the scrap. Deposition of David A. Zaitlin, January 5, 1995, at 20, 24, 32 ("D. Zaitlin"); M. Zaitlin I at 7–8. In the mid- to late 1980s, a change in regulations pertaining to underground tanks required Saco Steel to close the concrete pit. M. Zaitlin I at 22–23; Deposition of Michael A. Zaitlin, December 5, 1994, at 33, 34, 44 ("M. Zaitlin II"). Thereafter, Saco Steel stored the turnings and cuttings on the ground near the concrete pit, where they would stay for varying periods of up to two months. M. Zaitlin I at 39–40; M. Zaitlin II at 32, 34, 90, 93–94; Deposition of Joseph G. Cloutier, April 26, 1995, at 18–19, 23, 26–27 ("Cloutier I"). Saco Steel also received turnings and cuttings from other customers, including Smith & Wesson, Hill Acme, Precision Screw, Heidelberg Harris, McAllister Machine, Pratt & Whitney, and Gabriel Electronics.[5] D. Zaitlin at 41–46, 54, 58–59; M. Zaitlin II at 58–59, 67–73. Saco Steel employees occasionally commingled turnings and cuttings from other customers with those from Saco Defense. D. Zaitlin at 45, 54; M. Zaitlin II at 81, 84–85, 89; Cloutier I at 18–19, 22–23, 26–27. In addition to the turnings and cuttings, Saco Steel accepted other materials from Saco Defense, including artillery shells, scrap shock absorbers, outside scrap machinery, and heat-treated scrap. Bolduc at 33–36.

In October 1989, Saco Steel submitted its final application to the Maine Department of Environmental Protection ("DEP") for a permit to add an automobile shredder to its facility. M. Zaitlin II Ex. 9 at ¶ 5. See M. Zaitlin II Ex. 4. In 1990, Saco Steel received that permit and began construction of the shredder, which was operational by mid–1991. Id. In October 1991, a routine DEP inspection of Saco Steel's site for compliance with the terms of its state permit resulted in a notice of violation and the drafting of a consent order. Id. Since then, Saco Steel has undertaken to comply with that order, which was made final on October 15, 1992. Id. Saco Steel has had no contact with the United States Environmental Protection Agency ("EPA") regarding the contamination

---

**3.** "Sludge" is referred to elsewhere in the record as "swarf." See Lambert I Ex. P–9 at 2222.

**4.** Those invoices contained the following language:

Supplier hereby certifies and warrants that none of the materials being delivered or to be delivered to Saco Steel Co. hereunder is or contains a "hazardous substance" as defined in Section 101(14) of the Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 U.S.C. Sec. 9601(14). Supplier agrees that, if Saco Steel Co. hereafter incurs any liability or obligation to any government or person resulting, directly or indirectly, from any breach by the Supplier of the foregoing warranty, Supplier shall indemnify Saco Steel Co. for all such liabilities and obligations, including reasonable attorneys' fees and costs of litigation.
Lambert I Ex. P–6.

**5.** Hill Acme now conducts business under the name Hill–Loma. Heidelberg Harris now conducts business under the name Heidelberg North America. The parties have agreed to drop Pratt & Whitney as a third-party defendant and add in its place its parent company, United Technologies Corporation. Docket No. 95.

here at issue, nor has any party contended that the DEP consent order addresses Saco Steel's liability under CERCLA. *Id.* at ¶ 6. *See* M. Zaitlin II Ex. 18 at 4–6.

Soil tests conducted at Saco Steel by its expert, Robert W. Gillespie, have indicated the presence of several metals considered "hazardous substances," including arsenic, barium, chromium, and lead,[6] that were also found in soil at Saco Defense. Deposition of Robert W. Gillespie at 26, 60, Ex. 4 at 14–15 ("Gillespie"). Soil at Saco Steel also contained cobalt, an element which does not occur naturally in this region, but is present in stellite, a material used particularly by Saco Defense. Gillespie at 26, Ex. 4 at 15. Petroleum hydrocarbons and polychlorinated biphenyls ("PCBs") were also found at Saco Steel, almost exclusively in soil from the stockpile area where the turnings and cuttings were stored. Gillespie at 98, Ex. 4 at 13. Saco Defense has admitted that PCBs were both present and used, in at least certain limited ways, at its facility. Saco Defense's Answers to Saco Steel's Request for Admissions at ¶ 7.

### III. DISCUSSION

#### A. CERCLA (Count IX)

 It is necessary as a preliminary matter to clarify the nature of Saco Steel's CERCLA claim. Two separate and distinct actions are available to a private plaintiff under CERCLA: (1) a response cost recovery action under § 107(a), and (2) a contribution action under § 113(f). *United Technologies Corp. v. Browning–Ferris Industries,* 33 F.3d 96, 98 (1st Cir.1994) *cert. denied,* —— U.S. ——, 115 S.Ct. 1176, 130 L.Ed.2d 1128 (1995). A response cost recovery action under § 107(a) is available only to an "innocent party," or a plaintiff who does *not* bear

CERCLA liability, for recovery from liable or potentially liable parties of *all* of the cleanup costs the plaintiff has incurred. *United Technologies,* 33 F.3d at 100. Liability under § 107(a) is joint and several unless a defendant carries the "especially heavy burden" of showing that liability is divisible, *i.e.,* that there is a reasonable basis for apportioning the harm. *In re Hemingway Transport, Inc.,* 993 F.2d 915, 921 & n. 4 (1st Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 303, 126 L.Ed.2d 251 (1993); *O'Neil v. Picillo,* 883 F.2d 176, 178 (1st Cir.1989), *cert. denied,* 493 U.S. 1071, 110 S.Ct. 1115, 107 L.Ed.2d 1022 (1990). *See United States v. Chem–Dyne Corp.,* 572 F.Supp. 802, 809–11 (S.D.Ohio 1983). A contribution action under § 113(f) is available only to a "non-innocent party," or a plaintiff who *already* bears CERCLA liability,[7] for recovery from other liable or potentially liable parties of that *part* of the cleanup costs the plaintiff has incurred that exceeds the plaintiff's *pro rata* share. *United Technologies,* 33 F.3d at 100. Liability for contribution under § 113(f) is not joint, but several. *United States v. Kramer,* 757 F.Supp. 397, 414 (D.N.J.1991); *City of New York v. Exxon Corp.,* 766 F.Supp. 177, 197 (S.D.N.Y.1991). For an especially clear and thorough discussion of this issue, *see Olin Corp. v. Fisons PLC,* No. 93–11166–MLW, slip op. at 9–11, 1995 WL 811961 (D.Mass. Apr. 24, 1995) (Report and Recommendation of Karol, M.J.).

 In this case, the only CERCLA action currently available to Saco Steel against Saco Defense is for total response cost recovery under § 107(a). This Court finds Saco Steel to be an "innocent party" for present purposes because Saco Steel has not admitted, nor has any other party produced any evidence to show, that Saco Steel actually bears joint and several CERCLA liability,

---

**6.** In defining the term "hazardous substance" in 42 U.S.C. § 9601(14), CERCLA incorporates by reference the substances designated as hazardous or toxic under the Clean Air Act, 42 U.S.C. § 7412, the Clean Water Act, 33 U.S.C. §§ 1317(a), 1321(b)(2)(A), the Resource Conservation and Recovery Act of 1976 ("RCRA"), 42 U.S.C. § 6921, and the Toxic Substances Control Act, 15 U.S.C. § 2606. *United States v. Wedzeb Enterprises, Inc.,* 844 F.Supp. 1328 (S.D.Ind. 1994). The various metals listed above, as well

as the PCBs discussed below, are "hazardous substances" under these statutes.

**7.** CERCLA liability that renders a party "non-innocent," and, therefore, entitled to bring a contribution action under § 113(f), may come in the form of a consent order. *See, e.g., Central Maine Power v. F.J. O'Connor,* 838 F.Supp. 641, 644 (D.Me.1993); *Transtech Indus., Inc. v. A & Z Septic Clean,* 798 F.Supp. 1079, 1086 (D.N.J. 1992).

the predicate of a CERCLA contribution action.[8] Although Saco Steel has submitted to a consent order, it has done so with the Maine Department of Environmental Protection in order to remedy certain violations of state law, not of CERCLA. *Cf. State of Arizona ex rel. Woods v. Nucor Corp.*, 825 F.Supp. 1452, 1455 (D.Ariz.1992) (affirming a proposed settlement agreement with Arizona Department of Environmental Quality that specifically addresses defendant's liability under § 107 of CERCLA). Moreover, Saco Defense will face joint and several liability if Saco Steel prevails in its § 107(a) action because Saco Defense has made no attempt to satisfy the onerous burden of demonstrating the divisibility of the environmental harm here at issue.[9] *See, e.g., Exxon*, 766 F.Supp. at 197. Therefore, Saco Steel's CERCLA claim will be for total response cost recovery from Saco Defense under § 107(a).

The Court of Appeals for the First Circuit has articulated the four necessary elements of a prima facie case in a private-party lawsuit under § 107(a) of CERCLA: (1) defendant must fall within one of four categories of covered persons, 42 U.S.C. § 9607(a)(1)–(4); (2) there must have been a "release or threatened release" of a hazardous substance from the relevant facility, 42 U.S.C. §§ 9607(a)(4), 9601(14), 9601(22); (3) that release or threatened release must "cause[ ]

the incurrence of response costs" by plaintiff, 42 U.S.C. § 9607(a)(4); (4) those costs must be "necessary [and] ... consistent with the national contingency plan," 42 U.S.C. §§ 9607(a)(4)(B), 9601(23)–(25). *Dedham Water Co. v. Cumberland Farms Dairy, Inc.*, 889 F.2d 1146, 1150 (1st Cir.1989).

In this case, Plaintiff generates a genuine issue of material fact as to all four necessary elements of its CERCLA claim. First, Plaintiff has produced enough evidence for a reasonable jury to find that Saco Defense is a covered person under § 107(a)(3), which extends CERCLA liability to "any person who by contract, agreement or otherwise arranged for disposal or treatment ... of hazardous substances owned or possessed by such person...." 42 U.S.C. § 9607(a)(3). Saco Steel's evidence includes invoices for its receipt of the allegedly contaminated turnings and cuttings from Saco Defense; testimony that Saco Defense allowed various unknown wastes and sludge to be discarded into barrels containing those turnings and cuttings; testimony that Saco Defense's turnings and cuttings commonly left Saco Defense and arrived at Saco Steel with discernible liquid flow; soil tests indicating the presence of similar hazardous substances in soil at Saco Defense and at Saco Steel where Saco Defense materials were deposited.[10]

8. Contrary to the suggestion of some parties to this litigation, (Memorandum of Third–Party Defendants in Support of Their Motion for Summary Judgment (Docket No. 83) at 5; Saco Defense's Objection to Motion for Summary Judgment (Docket No. 93) at 2), a plaintiff's mere failure to declare that it is an "innocent" party does not establish that party's CERCLA liability, and, therefore, does not establish that party's "non-innocence" for purposes of determining what kind of CERCLA action it may bring. Nor does Saco Steel's admission that it seeks only Saco Defense's *pro rata* share of the harm establish Saco Steel's CERCLA liability and "non-innocence." Memorandum of Third–Party Defendants in Support of Their Motion for Summary Judgment (Docket No. 83) Ex. A. *See United Technologies*, 33 F.3d at 101 (predicating contribution action on plaintiff's *admission* of CERCLA liability).

9. Despite its failure even to allege that the harm is divisible on a reasonable basis, it appears that Saco Defense would prefer to avoid joint and several liability altogether rather than simply to soften that blow by seeking contribution from

Third–Party Defendants. *See* Defendant Saco Defense's Objection to Third–Party Defendants' Motion for Summary Judgment (Docket No. 93) at 2. Similarly, Saco Steel's admission to Third–Party Defendants that it seeks only Saco Defense's *pro rata* share of the harm suggests that Saco Steel, too, considers the harm divisible. *See* Memorandum of Third–Party Defendants in Support of Their Motion for Summary Judgment (Docket No. 83) Ex. A. The parties must clarify their positions on this issue. If the parties do, in fact, agree that the harm in this case is divisible on a reasonable basis, they should promptly supply the Court with evidence probative of what that basis might be. Until that time, Saco Defense will remain exposed to the risk of joint and several liability under § 107(a), and Third–Party Defendants will remain exposed to contribution actions by Saco Defense under § 113(f).

10. In response, defendant asserts that Plaintiff's admission that it "is unaware of any specified chemical constituents of the coolant oil contained in the Saco Defense turnings delivered to Saco Steel," Defendant's Request for Admissions

Second, neither party disputes that hazardous substances were released at Saco Steel's facility. Third, Saco Defense has acknowledged that Saco Steel has at least incurred the response cost of the expert environmental study conducted by R.W. Gillespie & Associates. Defendant's Request for Admissions (Docket No. 81, Att. A) ¶ 22. Fourth, that investigation cost is recoverable regardless of its consistency with the national contingency plan.[11] *Marriott Corp. v. Simkins Industries, Inc.*, 825 F.Supp. 1575, 1584 (S.D.Fla.1993); *Carlyle Piermont Corp. v. Federal Paper Board Co.*, 742 F.Supp. 814, 821 (S.D.N.Y.1990). Therefore, Plaintiff has generated a genuine issue of material fact as to all contested elements of its cost recovery action under § 107(a) of CERCLA, and thereby survives Defendant's motion for summary judgment.

## B. Supplemental Jurisdiction

Defendant has challenged the propriety of this Court's exercise of supplemental jurisdiction over Plaintiff's state claims in the event that Plaintiff's federal claim is dismissed. Because Plaintiff's CERCLA claim has survived summary judgment, that challenge loses its force. Moreover, this Court finds the exercise of supplemental jurisdiction to be entirely appropriate under the relevant statute. 28 U.S.C. § 1367(a). This Court will retain jurisdiction, then, over Plaintiff's state law claims, which it will now consider in turn.

## C. Strict Liability (Count II)

Maine law provides that one who disposes of hazardous waste be held strictly liable for the damage that disposal causes to others. 38 M.R.S.A. § 1319–U(5). *See Murray v. Bath Iron Works*, 867 F.Supp. 33, 48 (D.Me.1994) (citing *Hanlin Group, Inc. v. International Minerals & Chemical Corporation*, 759 F.Supp. 925, 933 & n. 13 (D.Me. 1990)) (finding Maine Law Court would recognize common law strict liability action for disposal of hazardous waste). Saco Steel submits evidence that would allow a reasonable jury to find that Saco Defense has disposed of hazardous waste that has caused injury to Saco Steel. This evidence includes the deposition testimony and environmental testing discussed above in connection with Plaintiff's CERCLA claim. *See supra* Section III.A. In its only serious opposition to this state law claim,[12] Saco Defense argues that the oil alleged to have coated its turnings neither contained hazardous substances nor fit the definition of "waste oil" under Maine law. Saco Steel, however, produces adequate evidence to raise an issue of fact regarding whether any hazardous substances other than oil also coated Saco Defense's turnings. *See supra* note 10. This claim, therefore, also survives Defendant's motion for summary judgment.

(Docket No. 81, Att. A) ¶ 23, eliminates the issue that Plaintiff's evidence generates regarding whether the Saco Defense turnings contained "hazardous substances," as required by § 107(a)(3). It is not even necessary, to invoke the principle that ambiguous, defaulted admissions should be construed narrowly, *see Talley v. United States*, 990 F.2d 695, 699 (1st Cir.1993), to find that this admission does not contradict Plaintiff's evidence. Because coolant oil is not the only substance alleged to have contaminated the Saco Defense turnings, *see* Bolduc at 32–33, 50–51, the chemical composition of that oil would not constitute the sum of potential "hazardous substances" allegedly transferred to Saco Steel via the turnings. Moreover, Saco Steel's admission establishes only Saco Steel's ignorance of the composition of the coolant oil at the time the admission was made; nothing prevents Saco Steel from presenting any evidence that may have since relieved it of that ignorance.

11. It suffices for the purposes of this motion that Saco Steel has created a genuine issue of material fact regarding at least one recoverable cost. Therefore, it is unnecessary to address the recoverability of Plaintiff's other alleged response costs, whether past (if any) or future, save one: attorneys' fees are not recoverable under CERCLA. *See Key Tronic Corp. v. United States*, —— U.S. ——, ——, 114 S.Ct. 1960, 1965, 128 L.Ed.2d 797 (1994).

12. Saco Defense also makes two brief conclusory assertions in its reply brief, without citation to authority, citation to the record, or developed argumentation. Saco Defense's Reply to Saco Steel's Objection to Summary Judgment (Docket No. 96) at 3.

### D. Private Nuisance (Count III) [13]

 Maine law recognizes the tort of private nuisance, which lies where a defendant's use of its own land causes injury to adjoining or neighboring land. *Hanlin Group*, 759 F.Supp. at 935. *See* 17 M.S.R.A. § 2701; *Pettengill v. Turo*, 159 Me. 350, 193 A.2d 367 (1963). In this case, however, Defendant's alleged activity on its own land, generating hazardous substances, did not, by itself, cause injury to Plaintiff's neighboring land; Defendant could continue that conduct indefinitely without injuring Plaintiff. Plaintiff sustained injury only after Plaintiff purchased the turnings containing the alleged hazardous substances and transported them onto its own property. Though Plaintiff may have an action for that injury under several legal theories, *see, e.g.,* Counts II, V, IX, private nuisance is not among them. This Court, therefore, will grant Defendant's motion for summary judgment as to Count III.

### E. Wrongful Involvement in Litigation (Count IV)

 Maine law does not recognize the tort of wrongful involvement in litigation. *Hanlin Group*, 759 F.Supp. at 937–38 & n. 17. Therefore, this Court will grant summary judgment on Count IV.[14]

### F. Contractual Indemnification (Count V)

 Saco Steel claims that Saco Defense has a contractual duty of indemnification according to the terms and conditions contained in the invoices Saco Defense accepted from Saco Steel when Saco Steel accepted turnings from Saco Defense. In support of this claim, Saco Steel has submitted to this Court copies of some of those signed invoices, all of which contain warranty and indemnification clauses. *See supra* note 4. Plaintiff also submits various articles of evidence, also discussed above, tending to show that the materials from Saco Defense contained hazardous substances, and, therefore, that the warranty has been breached. To prevail on summary judgment, Defendant must demonstrate either that the contractual provision is unenforceable as a matter of law or that Plaintiff's evidence that the provision was breached is inadequate as a matter of law. Defendant makes no serious attempt to do either. *See Hanlin Group*, 759 F.Supp. at 931. Instead, in a footnote, Defendant refers to its own evidence, which is not nearly so persuasive and weighty as would be necessary to extinguish the genuine issues of material fact created by Plaintiff's evidence. Therefore, Saco Steel's indemnification claim may go forward to trial.

### G. Tortious Interference with Contractual and Business Relationships (Count X)

This Court will treat Plaintiff's request to dismiss, without prejudice, its claim for tortious interference with contractual and business relationships as a motion to that effect. Plaintiff Saco Steel's Response to Defendant Saco Defense's Motion for Partial Summary Judgment (Docket No. 86) at 17. This Court will grant that motion.

### IV. CONCLUSION

Accordingly, it is *ORDERED* that Defendant Saco Defense's Motion for Partial Summary Judgment be, and it is hereby, *GRANTED* as to Counts III and IV of Plaintiff Saco Steel's Seventh Amended Complaint, and it is *DENIED* as to Counts II, V, and IX of that Complaint. It is further *ORDERED* that Plaintiff's motion to dismiss, without prejudice, Count X of its Seventh

---

**13.** This Court will grant Plaintiff's motion to dismiss voluntarily the *public* nuisance claim also contained in Count III. Plaintiff Saco Steel's Response to Defendant Saco Defense's Motion for Partial Summary Judgment (Docket No. 86) at 16.

**14.** Dismissal of Count IV does not prevent Plaintiff from seeking certain attorneys' fees as an element of consequential damages caused by the various torts Plaintiff alleges under Maine law.

*See Gagnon v. Turgeon*, 271 A.2d 634, 635 (Me. 1970) ("Where the wrongful act of a defendant has involved the plaintiff in litigation with others, or placed him in such relation to others as makes it necessary for him to incur expense to protect his interest, such costs and expenses, including attorneys' fees, must be treated as the legal consequence of a wrongful action and may be recovered as damages."); Restatement (Second) of Torts § 914 (1979).

Amended Complaint be, and it is hereby, *GRANTED.*