**G.J. LEASING COMPANY, INCORPORATED, doing business as Cahokia Marine Service and S.I. Enterprises, L.P., Plaintiffs–Appellants,**

v.

**UNION ELECTRIC COMPANY, Defendant–Appellee.**

No. 94–2972.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 20, 1995.

Decided May 4, 1995.

380

Bruce D. Ryder (argued), Joseph G. Nassif, Jane Fedder Lazaroff, Coburn & Croft, St. Louis, MO, for plaintiffs-appellants.

Paul N. Venker, Thomas B. Weaver, Edwin L. Noel (argued), Susan B. Knowles, Armstrong, Teasdale, Schlafly, Davis & Dicus, St. Louis, MO, for defendant-appellee.

Before POSNER, Chief Judge, FLAUM, Circuit Judge, and McDADE, District Judge.[*]

POSNER, Chief Judge.

G.J. Leasing—we can ignore the other plaintiff—filed this suit in 1991 against Union Electric, which in 1979 had sold a 52-acre tract containing a decommissioned power plant to G.J. Leasing's predecessor. The suit charges that the sale constituted the disposal (or the arranging of the disposal) of a hazardous substance, namely the asbestos in the plant. If this is right, then the seller, Union Electric, as the owner of the facility at which the hazardous substance was disposed of, or, equally, as the arranger of the disposal, was responsible under sections 107(a)(2) or (3) of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA) for the costs of cleaning up. 42 U.S.C. §§ 9607(a)(2), (3). The suit also charges that the sale constituted an abnormally dangerous activity within the meaning of Illinois tort law, making Union Electric strictly liable for the consequences, which include the clean-up costs. After resolving some issues, and refusing to resolve others, at the summary judgment stage, 825

[*] Hon. Joe Billy McDade of the Central District of Illinois, sitting by designation.

**382**

F.Supp. 1363 (S.D.Ill.1993), Chief Judge Gilbert conducted an eleven-day bench trial, after which he entered judgment for Union Electric accompanied by detailed findings of fact. 854 F.Supp. 539 (S.D.Ill.1994).

■ The appeal is marred by a grave error on the part of the appellant. In the part of its opening brief labeled "Standard of Review," G.J. Leasing tells us that appellate review of the district judge's resolution of mixed questions of law and fact is plenary. The term "mixed question of law and fact" refers to questions about the application of a rule or standard to the particular facts of the case. The question whether the defendant in a personal injury suit was negligent is a familiar illustration. For the proposition that the district judge's answer to such questions (when he is the trier of fact, rather than merely presiding at a jury trial or reviewing an administrative determination) is to be given no deference by us, G.J. Leasing cited a single case, and from a different circuit. In this court the rule, to which there are some exceptions but none applicable to the CERCLA issues, is that a district judge's determinations of mixed questions of fact and law, as of questions purely of fact, can be set aside on appeal only if clearly erroneous. E.g., *Williams v. Commissioner,* 1 F.3d 502, 505 (7th Cir.1993). Union Electric pointed this out in its brief, to which G.J. Leasing responded weakly in its reply brief that "while there is divergence in this Circuit on the appropriate standard of review, the older and more prevailing rule is that when the trial court's ultimate determination is a mixed question, it is more freely reviewable than under the 'clearly erroneous' test. That rule has not been overturned by this Court and must govern today." It *has* been overturned. The three cases that G.J. Leasing cites for the "older and more prevailing rule" come two from the 1950s and one, the most recent, from 1976. It may be the older rule; it certainly is not the prevailing rule in this circuit.

G.J. Leasing's misstep concerning the standard of review is important because many of the questions in the case are mixed questions of fact and law, such as whether the sale of the power-plant complex was the disposal or an arrangement for the disposal of a hazardous substance, whether Union Electric used due care in preparing the property for sale, and whether the costs that G.J. Leasing incurred to remove asbestos from the site were necessary. G.J. Leasing has explained why it thinks the answers given by the district judge were erroneous, but not why it thinks the errors clear enough to be reversible by us.

■ We have gotten ahead of our story, however, and must return to the beginning. The beginning is 1923, when Union Electric built and put into operation the Cahokia Power Plant, a major coal-burning electrical-generating plant, on a tract of land in an industrialized area along the Mississippi River in Sauget, Illinois, opposite St. Louis. The generation of electricity creates tremendous heat. As was common in those days, asbestos was used as the principal material for heat insulation, not only in the walls and ceilings of the plant itself but also in the boilers, generators, turbine, steam lines, and other equipment installed in it. The Cahokia Power Plant became the major source of electricity throughout its region. Later the plant was converted from coal to oil. By 1976 the 52–acre tract included not only the plant but also a warehouse, office building, truck-maintenance facility, several above-ground and underground petroleum storage tanks, and mooring rights on the river shore. The rub was that the plant, including its equipment, was obsolete. All of Union Electric's demand was being supplied by its other plants, which were newer and cheaper to operate. Union Electric decided to decommission the plant, and it did so that year. The only motive in decommissioning was that the plant had become uneconomical. The fact that there was asbestos insulation in the building and its equipment played no role. And there is no evidence that if Union Electric had continued using the plant it would have had to do something about the asbestos. The asbestos was not leaking, and there is, as we shall see, no general duty to remove asbestos from a building.

Having no further use for the property, Union Electric decided to sell it lock, stock, and barrel, as is, with all equipment included.

It was understood that the purchaser, rather than using the power-generating equipment or removing it for sale to someone else who could use it, might decide to demolish it on the site in order to recover the considerable amount of iron, steel, copper, and lead that the equipment contained. But Union Electric had no interest in what a purchaser might want the property for. It just wanted to sell to the highest bidder and get out. It invited bids from 82 firms. Some were specialists in salvage. Others were manufacturers, oil companies, barge operators, and other companies that might have a use for the property other than as a mine of valuable metals. The bidders were invited to tour the property. The tours were interrupted by serious flooding which occurred in March 1978 and resulted in considerable damage to the now unoccupied power plant and its disused equipment. The district judge found, however, not clearly erroneously, that Union Electric cleaned up the property completely and that it was in excellent condition when the tours resumed.

The high bidder (at $1.6 million) did turn out to be a salvage and demolition contractor, by the name of G & S Motor Equipment. The purchase was actually a joint venture between G & S and Sarnelli Brothers, another salvage contractor. One of the losing bidders was G.J. Leasing, which after losing went to G & S and Sarnelli and made the following deal: G & S and Sarnelli would resell the property to G.J. Leasing for $1 million, but Sarnelli would retain the right to salvage valuable metals from the power equipment. G.J. Leasing had no interest in recovering valuable metals. It was in the transportation business and wanted to develop the property as an intermodal transportation facility. The salvage operation must have been expected to yield a sufficient profit to bring the total consideration for the resale up to, and probably at least a little higher than, the $1.6 million price that G & S and Sarnelli had agreed to pay Union Electric. G & S and G.J. Leasing alike had toured the property extensively before the purchase and repurchase were consummated. They knew there was asbestos in the insulation of the equipment and parts of the building. There is no claim of fraud.

Union Electric knew all about the intended resale, which in fact occurred the same day as the sale itself, in 1979. Sarnelli went to work the following year. Its deal with G.J. Leasing gave it two years in which to salvage valuable metals from the equipment. It went through the power plant like a tornado and left the building a shambles. Some of the asbestos insulation was torn or smashed. Sarnelli removed some of the asbestos from the property (duly notifying the environmental authorities of this, as it was required to do by law), but left some lying around.

Nothing happened for a while. Then in 1984 G.J. Leasing hired a former sheet metal worker, Marvin Schwartz, to convert the property into an intermodal transportation facility. Schwartz was either ignorant of or casual about the potential hazards of asbestos (or maybe both) and made no effort to remove any of the asbestos in the building, even though his own demolition activities, undertaken as part of the conversion, were extensive (they included the use of dynamite to destroy an ancillary structure attached to the power plant building) and further damaged the asbestos insulation. While all this was going on, G.J. Leasing began storing grain in the basement of the building, though we were reassured to learn at the oral argument that the grain was intended for horses rather than for humans.

Finally in 1988 G.J. Leasing woke up to the possibility of an asbestos problem, and it hired an expert, David Schau, to investigate. He found a good deal of asbestos insulation in deteriorated condition. While the number of asbestos fibers in the air was insufficient to pose a hazard to the workers at the emerging intermodal facility, he was concerned that continued flaking of the asbestos would eventually cause a problem. He recommended that the facility not be used for the storage of grain and that the amount of time a worker was allowed to spend in the building be limited. (The only exposure to asbestos is within the building. There is no danger to any other part of the site, or to the river, or to occupants of adjacent properties.) G.J. Leasing decided instead to remove at least some of the asbestos, and did so at a

cost of a little more than $200,000—which it wants back in this suit, along with a declaration that Union Electric is liable for the costs, in a yet to be determined amount, of removing other asbestos from the building.

Asbestos is a hazardous substance within the meaning of CERCLA. *3550 Stevens Creek Associates v. Barclays Bank*, 915 F.2d 1355, 1360 (9th Cir.1990). But Union Electric argues that the sale of a building that happens to contain asbestos insulation is not the disposal of a hazardous substance within the meaning of the Act, or even the arranging for the disposal (which the Act treats similarly), merely because the purchaser, or the purchaser's purchaser, or some other successor in ownership, decides to remove some or all of the asbestos in the building. There are many routes to this conclusion, but the simplest is that the sale of a product which contains a hazardous substance cannot be equated to the disposal of the substance itself or even the making of arrangements for its subsequent disposal, *id.* at 1359–65; *Florida Power & Light Co. v. Allis Chalmers Corp.*, 893 F.2d 1313 (11th Cir.1990); compare *Louisiana–Pacific Corp. v. ASARCO, Inc.*, 24 F.3d 1565, 1575 n. 6 (9th Cir.1994), just as—we held in *Amcast Industrial Corp. v. Detrex Corp.*, 2 F.3d 746, 751 (7th Cir.1993)—arranging for the transportation of a product is not to be equated to arranging for the spillage of its hazardous contents.

These distinctions are necessary because otherwise the sale of an automobile would be the disposal of a hazardous substance, since an automobile contains a battery, and a battery contains lead, which is a hazardous substance. (For that matter, the equipment sold along with the power plant in this case contained hundreds of tons of lead, but G.J. Leasing makes nothing of that.) And the sale of any building that contained asbestos insulation (and we are told that more than 700,000 commercial buildings in the United States fit this description) would be the disposal of a hazardous substance, because while the asbestos is harmless as long as the asbestos fibers are not allowed to leak out of the walls or other building components in which the insulation was placed, asbestos is, like lead, a hazardous substance.

Those would be preposterous results. But at the other extreme is the case of the owner of a facility containing hazardous wastes—perhaps a retaining pond of highly toxic solvents—who wants to get rid of the wastes without liability under CERCLA and to this end sells the facility to a purchaser who does not suspect the presence of the wastes and would not have bought the property had he known of them. This would be the disposal of a hazardous substance by subterfuge, and the seller would be liable to the buyer for clean-up costs under section 107(a)(2). *United States v. Aceto Agricultural Chemicals Corp.*, 872 F.2d 1373, 1381 (8th Cir.1989).

In the middle would be a mixed-motives case, where the seller's goal was both to get rid of wastes and to make a bona fide sale of commercially valuable property. Perhaps *Catellus Development Corp. v. United States*, 34 F.3d 748 (9th Cir.1994), on which G.J. Leasing so heavily relies, was such a case. The owner of an auto parts company would receive worn-out batteries from his customers and sell them to a battery cracking plant which extracted the lead from them and then dumped the battery casings—resulting in contamination, because the casings contained lead too. The court held that the auto parts company, knowing what its purchaser would do with the batteries, had to be deemed to have arranged for the disposal of the lead in the casings, a hazardous substance. The decision could be questioned on the ground that it implies (unless some limiting principle can be devised) that the manufacturer of the batteries was himself an arranger of disposal, since he must have known where spent batteries end up. Perhaps the limiting principle is supplied by a regulation of the EPA, on which the court relied, which provides that materials sold for reclamation—and the regulation gives spent batteries as an illustration—are to be deemed hazardous waste. 34 F.3d at 752.

*Catellus* lies at the very frontier of the law; this case lies beyond the frontier. Union Electric could not know whether the sale of the 52–acre tract would ever result in the

release of asbestos fibers. That would depend on the buyer's intentions and how those intentions were implemented. It was likely though far from certain that the buyer would remove or demolish equipment in order to salvage the valuable metals in it, but depending on the care with which the work was done there might be no emission of asbestos fibers, hence no disposal of a hazardous substance. In *Catellus* it was inevitable that at the end there would be lead-containing, hence contaminating, battery casings to discard. It was not inevitable that any asbestos would either be removed from the 52–acre site or leak into the interior of the plant or (what is more to the point, as we are about to see) into the adjacent air, land, or water.

We are assuming that there was no asbestos leaking at the time of the sale, hence no "disposal" of a hazardous substance. G.J. Leasing argues that there was such leakage, as a consequence of Union Electric's failing to clean up adequately after the flood, This presents a factual question which the district judge resolved against G.J. Leasing, and the resolution was not clearly erroneous. Anyway the release of asbestos inside a building, with no leak outside (and there is no indication there was any at the time of the sale), is not governed by CERCLA. *Covalt v. Carey Canada Inc.*, 860 F.2d 1434, 1436–37 (7th Cir.1988); *People of State of California v. Blech*, 976 F.2d 525 (9th Cir.1992) (per curiam).

We may assume that had a primary purpose and likely effect of the sale of the 52–acre site been to bring about the removal of asbestos in circumstances that would make the release of fibers into the environment outside the plant inevitable or at least highly likely, Union Electric could be found, through that sale, to have disposed of or arranged for the disposal of a hazardous substance. *United States v. Aceto Agricultural Chemicals Corp.*, supra, 872 F.2d at 1381; *Cadillac Fairview/California, Inc. v. United States*, 41 F.3d 562, 566 (9th Cir.1994) (per curiam). But the district judge found the contrary, and the finding is entitled to the usual deference that we give findings on mixed questions of fact and law. Chief Judge Gilbert may have erred (though we doubt it), but he did not *clearly* err. G.J. Leasing argues that the judge was barred by the law of the case doctrine from finding that the property had *not* been sold for the purpose of demolition, because he had found the contrary—that demolition had been the purpose—in denying the relevant part of Union Electric's motion for summary judgment. That was not what he had found. He had found that there was a *genuine issue of material fact* concerning the purpose of the sale—in other words, that it was an open question whether the property had been sold for the purpose of demolition. The trial closed it.

There is a distinct reason why Union Electric is not a responsible party within the meaning of the Act, and it underscores the difference between this case and *Catellus*. There was no suggestion that the battery cracking plant had blundered in failing to extract the lead from the battery casings. But there is every reason to believe, and in fact Chief Judge Gilbert found, that such release of asbestos fibers as occurred at the 52–acre site was due to the ham-handed methods employed by Sarnelli Brothers and by Schwartz. There is no suggestion that Union Electric knew that Sarnelli Brothers would do a careless job (and of course it had never heard of Schwartz, the ex-sheet metal worker, who wasn't hired till five years after the sale), and the contention that carelessness on the part of Union Electric in maintaining the plant up until the sale contributed to the emission of fibers has been rejected. It seems to us very odd, even in Superfund Cloudcuckooland, to attribute the negligent, unforeseeable conduct of the buyer's agents to the seller. It amounts to saying that if X sells a box to Y with strict instructions not to open it, and Y does open it with resulting damage to his own property, X shall be deemed to have opened it. That is what G.J. Leasing is arguing for. The district court rejected this theory of liability, on the authority of CERCLA's third-party defense, and so do we. 42 U.S.C. § 9607(b)(3); *Environmental Transportation Systems, Inc. v. ENSCO, Inc.*, 969 F.2d 503 (7th Cir.1992); *Westwood Pharmaceuticals, Inc. v. Natural Fuel Gas Distribution Corp.*, 964 F.2d 85, 89

(2d Cir.1992). Any disposing or arranging for the disposal of asbestos here was done not by Union Electric but by G.J. Leasing.

■ The district court further found that the clean-up costs that G.J. Leasing incurred and the further costs that it wants to incur in order to remove still more of the asbestos are not "necessary" response costs within the meaning of CERCLA, and therefore Union Electric would not be liable for them even if it were a disposer or an arranger of disposal. 42 U.S.C. § 9607(a)(4)(B); *United States v. Hardage*, 982 F.2d 1436, 1447–48 (10th Cir. 1992). The statutory limitation to "necessary" costs of cleaning up is important. Without it there would be no check on the temptation to improve one's property and charge the expense of improvement to someone else. Suppose a building that was being used to warehouse heavy industrial equipment were found to have very low levels of contamination by some hazardous substance and only a small expenditure would be necessary to remove enough of the substance to make the building safe for its current use. Thinking this a perfect opportunity to upgrade that use, the owners decide to incur enormous costs to eliminate the contamination utterly, charge those costs to whoever was responsible for the current very low level of contamination, and then convert the building to a hospital, day care center, or dairy products plant. The limitation to "necessary" response costs would deter them from carrying out this scheme.

That, the district court found, was the situation here. (We have found no previous such case.) Schau did not recommend that G.J. Leasing remove any of the loose asbestos. He did not think the danger sufficient to warrant the expense, in light of what he considered cheaper alternatives such as restricting exposure of the workers and avoiding the storage of such a health-sensitive product as food grains. Of course he may have been insufficiently cautious; for that matter the exact tenor of his recommendations is unclear; nor is their cost indicated. G.J. Leasing could have called an additional expert to bolster its case for the necessity of its response costs. It did not. The district court's determination that the costs were not

necessary within the meaning of the statute is a perfect example of the resolution of a mixed question of fact and law. We review for clear error, and find none.

■ No more need be said about the CERCLA claim, so we turn to the common law tort claim. Under the common law of Illinois as of other states, a person who engages in an abnormally hazardous activity (what used to be called an "ultrahazardous" activity, changed we know not why) is strictly liable for any ensuing harms, with exceptions and qualifications numerous but unnecessary to discuss here. *Indiana Harbor Belt R.R. v. American Cyanamid Co.*, 916 F.2d 1174 (7th Cir.1990), and cases cited there; *Jones v. Beker*, 260 Ill.App.3d 481, 198 Ill.Dec. 214, 219, 632 N.E.2d 273, 278 (1994). Keeping a tiger in one's backyard would be an example of an abnormally hazardous activity. The hazard is such, relative to the value of the activity, that we desire not just that the owner take all due care that the tiger not escape, but that he consider seriously the possibility of getting rid of the tiger altogether; and we give him an incentive to consider this course of action by declining to make the exercise of due care a defense to a suit based on an injury caused by the tiger—in other words, by making him strictly liable for any such injury.

The curiosity here, if the asbestos be analogized to the tiger, is that the abnormally hazardous activity is conceived of as the sale of the thing that makes the activity hazardous, rather than as the activity itself. It is as if it were fine to keep the tiger in your backyard but if you sell it to someone else to put in *his* backyard and the tiger claws him, you are strictly liable for the injury. We cannot find any precedent, or any basis in common sense, for such a theory of strict liability. Of course there is also strict liability for the sale of a dangerous or defective product, but that is not the branch of strict liability to which G.J. Leasing appeals. Its theory is in fact absurd, and for the further reason that the ownership or operation of a building that contains asbestos insulation is not an abnormally hazardous activity. The asbestos is safe as long as it is not allowed to leak, and it can be prevented from leaking by

the taking of feasible precautions. When the danger of accident can be adequately contained by taking care rather than by eliminating or truncating the activity that creates the danger, there is no compelling reason to impose strict liability. *Indiana Harbor Belt R.R. v. American Cyanamid Co., supra,* 916 F.2d at 1179–80.

As if that weren't enough, the tort claim is also barred by the five-year statute of limitations applicable to a claim of property damage caused by an abnormally dangerous activity. 735 ILCS 5/13–205; *American Family Ins. Co. v. Village Pontiac–GMC, Inc.,* 182 Ill.App.3d 385, 131 Ill.Dec. 484, 486, 538 N.E.2d 859, 861 (1989). The suit was not brought until 1991. By that time the statute of limitations had run unless, as late as 1986, G.J. Leasing still had not, and in the exercise of reasonable diligence could not have, discovered that it had been injured as a consequence of an act by the defendant. The injury was the release of asbestos fibers into the interior of the power plant building, a release that G.J. Leasing ascribes however implausibly to the sale of the building. By sometime in 1984 at the latest, Schwartz, who was the plant's manager and an agent whose knowledge is attributed to G.J. Leasing for purposes of the statute of limitations, *Peterson v. Sealed Air Corp.,* 902 F.2d 1232, 1236 (7th Cir.1990); *FDIC v. Shrader & York,* 991 F.2d 216, 222–23 (5th Cir.1993), was finding and indeed removing asbestos exposed as a result of his demolition activities. The five-year statute of limitations began to run no later than this (much earlier if the lessee's, Sarnelli's, knowledge could be imputed to G.J. Leasing) and thus expired long before the suit was filed.

We commend Chief Judge Gilbert for moving this complex case along briskly and for resolving a large number of legally and factually complicated questions conscientiously and, so far as we can judge, correctly.

AFFIRMED.