**RSR CORPORATION and Quemetco, Inc., Plaintiffs,**

v.

**AVANTI DEVELOPMENT, INC., et al., Defendant.**

**No. IP 95–1359–C–M/S.**

United States District Court, S.D. Indiana, Indianapolis Division.

Sept. 2, 1999.

William A. Brewer III, Bickel & Brewer, Dallas, TX, Deborah Deitsch–Perez, Bickel & Brewer, New York, NY, Richard S. Vanrheenen, Vanrheenen & Associates, Indianapolis, IN, for RSR Corp.

William A. Brewer III, Bickel & Brewer, Dallas, TX, for Quemetco, Inc.

Paul G. Roland, Ruckelshaus Roland Hasbrook O'Connor, Indianapolis, IN, for Avanti Development, Inc.

Richard A. Ahrens, Lewis Rice & Fingersh, St. Louis, MO, Keith L. Beall, Fishers, IN, Curtis E. Beason, T.F. Olt III, Lane & Waterman, Davenport, IA, Edward P. Benchik, Jones Obenchain Ford Pankow Lewis & WoodsSouth, Bend, IN, Gregory P. Cafouros, Kroger Gardis & Regas, Indianapolis, IN, Lance W. Cargill, Akin, Gump, Strauss, Hauer & Feld, Dallas, TX, John R. Carr III, Buschmann Carr & Shanks, Indianapolis, IN, Thomas J. Costakis, Krieg Devault Alexander & Capehart, Indianapolis, IN, John R.

Cromer, Harrison & Moberly, Indianapolis, IN, L. Edward Cummings, Hart Bell Cummings Ewing & Stuckey, Vincennes, IN, Jerry A. Davis, Barbara Delanois, Davis and Delanois PC, Danville, IL, Frank J. Deveau, Sommer & Barnard, PC, Indianapolis, IN, Richard C. Ford, Leanne Burnett, Crowe & Dunlevy, Oklahoma City, OK, Susan M. Franzetti, Angela Foster–Rice, Gardner Carton & Douglas, Chicago, IL, Charles A. Grandy, Indianapolis, IN, D. Brandon Johnston, Knowles & Associates, Carmel, IN, Douglas B. King, Wooden & McLaughlin, Indianapolis, IN, Offer Korin, Katz & Korin, Indianapolis, IN, Patricia McCrory, Harrison Moberly, Indianapolis, IN, Andrew M. McNeil, Bose McKinney & Evans, Indianapolis, IN, Judith E. Overturf, Blythe & Ost, Indianapolis, IN, Dennis P. Reis, Rachel A. Schneider, Quarles & Brady, Milwaukee, WI, Leonardo D. Robinson, Plews Shadley Racher & Braun, Indianapolis, IN, Damon R. Sedita, Schwartz Tobia Stanziale Becker, Rosenweig & Sedita, Montclaire, NJ, R. Robert Stommel, Lewis & Wagner, Indianapolis, IN, Michael S. Wallack, Wallack & Wallack, Indianapolis, IN, Donn H. Wray, Stewart & Irwin, Indianapolis, IN, for defendants.

## ORDER

McKINNEY, District Judge.

Both of the plaintiffs, RSR Corporation and Quemetco, Inc., ("Plaintiffs" or "RSR/Quemetco") and the defendant, Ace Battery, Inc., ("Ace"), have filed motions for summary judgment in this matter. The Plaintiffs claim Ace is liable under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. §§ 9601–9675 (1995), for "arrang[ing] for disposal or treatment . . . of hazardous substances." *Id.* at § 9607(a)(3). Ace contends it is not responsible for clean-up costs under CERCLA because it delivered a useful product, not a solid waste. The parties have filed briefs in support of their cross-motions for summary judgment and the issues are now ready to be resolved. For the reasons discussed below, the Court **GRANTS** Ace's

motion for summary judgment and **DENIES** RSR/Quemetco's motion.

## I. FACTUAL & PROCEDURAL BACKGROUND

In 1994, the EPA found that the property on which a secondary lead smelter was located, contained contaminants. The secondary smelter was managed by Benjamin McKinney, ("McKinney"). One of the defendants, Ace Battery, Inc., was owned by Jim Kirkham ("Kirkham"). According to McKinney and Kirkham, Quemetco, Inc. ("Quemetco"), owned property under various titles at the contaminated site, now referred to as the "Avanti" site, from 1964 to 1972. McKinney Dep. at 22, 140, 148; Kirkham Dep. at 118. Quemetco and others had used the Avanti property to operate a secondary lead smelting facility. McKinney Dep. at 21–22. A secondary smelter collects scrap materials containing lead and processes them to produce new usable forms of lead. *Id.* at 21. Edward L. Puckett, a former employee of the smelter, explained that "smelting" is the process of placing scrap lead in a furnace to recover pure lead, lead oxide, and other lead alloys. Puckett Dep. at 190; McKinney Dep. at 21. In 1972, Quemetco ceased its operations at the Avanti site. McKinney Dep. at 140, 148. Quemetco was later acquired by Plaintiff, RSR Corporation. Third Am. Compl. ¶ 74.

In 1994, the Environmental Protection Agency ("EPA") found that the Avanti site Quemetco had used and the surrounding residential property were contaminated with lead, a hazardous substance. Admin. Order Pursuant to § 106(a) of CERCLA & Liability Act of 1980, as Am. 42 U.S.C. § 9606(a) ("Admin.Order"). The EPA directed RSR/Quemetco and others to clean up the site. *Id.* RSR/Quemetco filed this action in 1995 against Ace and other defendants, seeking contribution to its clean-up costs pursuant to CERCLA. 42 U.S.C. §§ 9607, 9613. The Plaintiffs claim that Ace is a responsible person under CERCLA because Ace had arranged for the

treatment or disposal of hazardous substances at the Avanti site. Third Am. Comp. ¶¶ 7, 24.

Ace's connection to the Avanti site was through a contract with Quemetco to supply lead plates for the secondary smelter. Ace, an independent battery breaker, contracted with Quemetco to break spent batteries (used car batteries) for Quemetco's use in its smelting operations. Kirkham Dep. at 43–47. Under the contract, Quemetco collected spent batteries from other sources and delivered them to Ace's battery-breaking facility. *Id.* Upon receiving the spent batteries from Quemetco, as well as from other third party sources, Ace would open them to remove the lead plates within. *Id.* at 60–61. The battery-breaking process involves opening the battery, removing the components from within, including lead plates, lead oxide, posts, and straps, collecting the loose lead components and storing them on the lead plates. *Id.* at 18–23. The plates were then loaded on a dump truck for delivery to a lead smelter. *Id.* at 22.

According to a Quemetco employee, Lawrence R. Bartlett ("Bartlett"), Ace delivered a certain amount of lead plates (based on the number of batteries Quemetco had dropped off) to Quemetco's smelting facility on the Avanti site and placed them in a pile at the facility. Bartlett Dep. at 100. Ace was paid for the lead plates based on their weight and the market value of lead. Kirkham Dep. at 46, 161, 186. Under this arrangement, Ace was paid for its services and Quemetco derived an economic benefit by using reclaimed lead rather than more expensive, newly mined lead. Bartlett Dep. at 240.

This order discusses the potential liability of Ace Battery. There are other battery-breaking companies brought in by RSR/Quemetco as defendants. Unless distinguished otherwise, this ruling may apply to all defendants whose connection to the Avanti site was solely through delivery of lead plates they had reclaimed from batteries broken at their own facility.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the opposing party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A disputed fact is material only if it might affect the outcome of the suit in light of the substantive law. *Id.*

The moving party has the initial burden to show the absence of genuine issues of material fact. *See Schroeder v. Barth*, 969 F.2d 421, 423 (7th Cir.1992). This burden does not entail producing evidence to negate claims on which the opposing party has the burden of proof. *See Green v. Whiteco Indus., Inc.*, 17 F.3d 199, 201 & n. 3 (7th Cir.1994). The party opposing a summary judgment motion bears an affirmative burden of presenting evidence that a disputed issue of material fact exists. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Scherer v. Rockwell Int'l. Corp.*, 975 F.2d 356, 360 (7th Cir.1992). The opposing party must "go beyond the pleadings" and set forth specific facts to show that a genuine issue exists. *See Hong v. Children's Mem. Hosp.*, 993 F.2d 1257, 1261 (7th Cir.1993), *cert. denied*, 511 U.S. 1005, 114 S.Ct. 1372, 128 L.Ed.2d 48 (1994). This burden cannot be met with conclusory statements or speculation, *see Weihaupt v. American Med. Ass'n*, 874 F.2d 419, 428 (7th Cir. 1989), but only with appropriate citations to relevant admissible evidence. *See* Local Rule 56.1; *Brasic v. Heinemann's Inc., Bakeries*, 121 F.3d 281, 286 (7th Cir.1997); *Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 923–24 (7th Cir.1994). Evidence sufficient to support every essential ele-

ment of the claims on which the opposing party bears the burden of proof must be cited. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

In considering a summary judgment motion, a court must draw all reasonable inferences "in the light most favorable" to the opposing party. *Spraying Sys. Co. v. Delavan, Inc.,* 975 F.2d 387, 392 (7th Cir. 1992). If a reasonable fact finder could find for the opposing party, then summary judgment is inappropriate. *Shields Enters., Inc. v. First Chicago Corp.,* 975 F.2d 1290, 1294 (7th Cir.1992). When the standard embraced in Rule 56(c) is met, summary judgment is mandatory. *Celotex Corp.,* 477 U.S. at 322–23, 106 S.Ct. 2548; *Shields Enters.,* 975 F.2d at 1294.

The Court will review defendant's motion for summary judgment in light of the foregoing standard.

## III.  DISCUSSION

### A.  SUMMARY OF ARGUMENTS

Plaintiffs assert that Ace is a "responsible person" under CERCLA because it "arranged for the disposal or treatment" of lead, a hazardous substance, at the Avanti site. Plaintiffs Mem. In Opp'n to Ace Battery, Inc.'s Mot. For Summ. J. and in Supp. of Plaintiffs' Cross–Mot. for Summ. J. at 1. More specifically, Plaintiffs contend that Ace dumped lead, a hazardous substance, at the Avanti site. According to the Plaintiffs, CERCLA is a strict liability statute which means Ace is liable regardless of whether it intended its delivery of lead plates to be for purposes of disposal and/or treatment. Further, Plaintiffs maintain that Ace may not invoke the useful product defense in this instance because the lead plates were no longer fit for their original intended use as car batteries. Therefore, Plaintiffs conclude that the Court should enter summary judgment in favor of RSR/Quemetco and find that Ace is a responsible person under CERCLA.

In response, Ace asserts that it is not a responsible person under CERCLA and is therefore not liable for clean-up costs. Ace argues that the delivery of lead plates to the Avanti site was not an arrangement for disposal, but was a delivery of a useful/valuable product under the terms of a contract, and that neither party intended for such activity to be for disposal. Instead, Ace contends that the process of reclaiming and selling lead plates constituted its principal business activity. Correspondingly, Ace asserts that summary judgment should be entered in its favor.

### B.  ANALYSIS

#### 1.  Statutory Framework

■ CERCLA was enacted by Congress in 1980 to "provide clean-up of hazardous waste from polluted sites throughout the United States." *Pneumo Abex v. High Point Thomasville & Denton,* 142 F.3d 769, 773 (4th Cir.1998), *cert. denied,* —— U.S. ——, 119 S.Ct. 407, 142 L.Ed.2d 330 (1998). To hold a defendant liable for clean-up costs under CERCLA, the law requires satisfaction of a four-part test. Plaintiffs must show that: "(1) the site in question is a 'facility' as defined by CERCLA; (2) the Defendant is a 'responsible person' for the spill as defined by CERCLA; (3) there was a release of hazardous substances; and (4) such a release caused the Plaintiff to incur response costs." *Environmental Transp. Systems, Inc., v. ENSCO, Inc.,* 969 F.2d 503, 506 (7th Cir.1992); *see also United States v. Wedzeb Enterprises, Inc.,* 844 F.Supp. 1328, 1333 (S.D.Ind.1994). There is no dispute in this case as to elements (1), (3), and (4). Therefore, the issues before the Court relate to the second element, whether Ace is a responsible person under CERCLA.

Persons are responsible for CERCLA clean up when their activities fit in one of four categories. 42 U.S.C. § 9607(a)(1)-(4) (1995).[1] Plaintiff alleges that Ace is liable

---

1.  The four categories of responsible persons subject to clean-up costs under CERCLA are:

(1) the owner and operator of a vessel or a facility,

under the third category, which provides that "any person who by contract, agreement, or otherwise arranged for disposal or treatment, of hazardous substances ... shall be liable." 42 U.S.C. § 9607(a)(3). This category is called "arranger liability."

Whether the contract between Quemetco and Ace was an arrangement for either disposal or treatment requires careful analysis. *See Wedzeb*, 844 F.Supp. at 1333; *United States v. Petersen Sand & Gravel, Inc.*, 806 F.Supp. 1346, 1354 (N.D.Ill.1992). CERCLA defines treatment and disposal the same as they are defined by the Solid Waste Disposal Act. 42 U.S.C. § 6903.[2] Plaintiffs would have the Court decide this issue categorically, by finding that a delivery of lead plates, a hazardous substance, is undoubtedly an arrangement for disposal or treatment. However, it is necessary to examine the details of the particular transaction between Ace and Quemetco to determine whether the delivery of lead plates truly constituted an arrangement for disposal or treatment, or whether it was a bona fide sale of a useful product.

The Fourth Circuit has explained when liability for arranging for treatment should be found.

The Solid Waste Disposal Act (SWDA) definition of 'treatment' presupposes discard. Had the authors of CERCLA not intended to adopt the presupposition of SWDA, they were certainly capable of defining 'treatment' otherwise ... Therefore, 'treatment ... of hazardous substances' as used in CERCLA refers to a party arranging for the processing of discarded hazardous substances or processing resulting in the discard of hazardous substances.

*Pneumo*, 142 F.3d at 774. Therefore, to find that Ace arranged for the treatment of a hazardous substance requires the court to determine whether the arrangement was for the discard of the lead plates. This requirement is necessary to finding an arrangement for disposal as well; the transaction must have been for the purpose of discarding the hazardous substances. *See Edward Hines Lumber Co. v. Vulcan Materials Co.*, 685 F.Supp. 651, 654 (N.D.Ill.1988), *aff'd*, 861 F.2d 155 (7th Cir.1988), ("liability for damages under § 9607(a)(3) attaches only to parties who transact in a hazardous substance in order to dispose of or treat the substance ... hence the sale of a hazardous substance for a purpose other than its disposal does not expose defendant to CERCLA liability").

> (2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of,
> (3) any person who by contract, agreement, or otherwise arranged for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing hazardous substances, and
> (4) any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities, incineration vessels or sites selected by such person, from which there is a release, or a threatened release which causes the occurrence of response costs, of a hazardous substance, shall be liable ...
> 42 U.S.C. § 9607(a)(1)-(4).

**2.** The Solid Waste Disposal Act (SWDA) provides the following definition of treatment:The

term "treatment" when used in connection with hazardous waste, means any method, technique, or process, including neutralization designed to change the physical, chemical, or biological character or composition of any hazardous waste so as to neutralize such waste or so as to render such waste nonhazardous, safer for transport, amenable for recovery, amenable for storage, or reduced in volume. Such term includes any activity or processing designed to change the physical form or chemical composition of hazardous waste so as to render it nonhazardous.
42 U.S.C. § 6903(34). The same statute also defines disposal as:
> discharge, injection, dumping, spilling, leaking, or placing, of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters.
*Id.* at § 6903(3).

■ It follows that arranger liability may be defeated when a defendant asserts and proves it was not disposing of, or delivering for treatment, a hazardous substance, but was selling a useful product. *See Prudential Ins. Co. v. U.S. Gypsum,* 711 F.Supp. 1244, 1253 (D.N.J.1989); *see also Douglas County, Neb. v. Gould, Inc.,* 871 F.Supp. 1242, 1245 (D.Neb.1994) (*quoting Catellus Dev. Corp. v. United States,* 34 F.3d 748, 750 (9th Cir.1994)). When the useful product defense is raised, the court must look beyond the defendant's assertions and "determine whether a transaction in fact involved an arrangement for the disposal of a hazardous substance." *Douglas County,* 871 F.Supp. at 1245, (*quoting United States v. Aceto Agric. Chems. Corp.* 872 F.2d 1373, 1381 (8th Cir.1989)). "Merely characterizing the transaction as a sale, however, is insufficient to avoid liability." *Prudential,* 711 F.Supp. at 1254. "There is no bright line between a sale and a disposal and the determination necessarily turns on a fact-specific inquiry into the nature of the transaction." *Douglas County,* 871 F.Supp. at 1245; *see also Pneumo,* 142 F.3d at 775 (employing a balancing test to determine whether a transaction was for discard of hazardous waste or for sale of valuable materials); *Amcast Indus. Corp. v. Detrex Corp.,* 2 F.3d 746 (7th Cir.1993) (courts look for an intent to dispose).

Some courts have found that "lead plates ... reclaim[ed] from spent batteries fall squarely within the law and regulations governing storage, disposal, and treatment of hazardous waste." *U.S. v. ILCO,* 996 F.2d 1126, 1130 (11th Cir.1993) (asserting that spent batteries and their components are subject to regulation by the EPA). However, the issue in this case goes far beyond the holding in *ILCO.* In that case, the sole issue was whether lead parts were a solid waste regulable under the Resource Conservation and Recovery Act ("RCRA"). Aside from the fact that *ILCO* was decided under RCRA, it also did not address the useful product defense, as is asserted by Ace in this case. The issue before this Court, although implicating the *ILCO* holding, further questions whether a sale of such lead plates could lead to CERCLA liability. To resolve that issue, the Court now turns to a fact-specific inquiry about the particulars of the transaction between Ace and Quemetco.

## 2. Intent

Courts have differed in their opinions about whether a party must have intended to arrange for disposal or treatment of a hazardous substance in order to be subject to arranger liability. *See Chatham Steel Corp. v. Brown,* 858 F.Supp. 1130, 1138 (N.D.Fla.1994) (finding that CERCLA is a strict liability statute making the parties' intent irrelevant); *U.S. v. Aceto Agric. Chemicals Corp.,* 872 F.2d. at 1380 (court disagreed with defendant's assertion that CERCLA statute required an intent to arrange); *but see Amcast,* 2 F.3d at 751 (no liability to a shipper who did not intend spillage by common carrier en route to delivery); *Pneumo,* 142 F.3d at 775; *Edward Hines,* 685 F.Supp. at 655 (court examined the motivation of the transaction); *U.S. v. A & F Materials,* 582 F.Supp. 842, 845 (S.D.Ill.1984) (same).

■ The Seventh Circuit however, has interpreted the language "arrange for" as suggesting intentional conduct. In *G.J. Leasing Co., Inc. v. Union Elec. Co.,* the court's decision was based on the intentions of the parties to the transaction. 54 F.3d 379 (7th Cir.1995) (holding that the sale of a building that contained asbestos insulation, released by the subsequent buyer during metal salvaging operations, was not an arrangement for disposal of a hazardous waste). "Union Electric [defendant] could not know whether the sale of the 52–acre tract would ever result in the release of asbestos fibers. That would depend on the buyer's intentions and how these intentions were implemented." *Id.* at 385. In *Amcast,* another Seventh Circuit case, the court reasoned that the defendant, whose product was spilled en route to a storage site by a common carrier making the delivery, did not intend for the substance to spill, and it refused to

hold the defendant liable for cleaning up that spill. 2 F.3d at 751. "When the shipper is not trying to arrange for the disposal of hazardous wastes, but is arranging for the delivery of a useful product, he is not a responsible person within the meaning of the statute." *Id.* Thus, in this circuit, the issue of the defendant's intent is relevant to determining whether the transaction in question was an arrangement for disposal or treatment, or the sale of a useful product. Because the useful product defense also contemplates a bona fide sales transaction, the Court must examine both the subjective intent of the parties, as revealed by their actions, and whether that intent was justifiable.

The Court must look beyond a mere assertion by Ace that the lead plates, although a hazardous substance, were delivered by Ace for productive use by Quemetco. The factors this Court will consider when assessing Ace's intent include: the type of agreement arranged between the two parties; the benefits reaped by the parties as a result of their transaction; and the purpose and or motive of the transaction.

Ace's primary business activity was to break batteries and reclaim the lead inside, and its profits came from the sale of lead plates. Quemetco sought out Ace's services and the two parties entered an agreement to allow Ace to make a profit and Quemetco to purchase less expensive sources of lead. These facts make it unlikely that Ace intended its sale of the lead plates to be an arrangement for the disposal or treatment of a hazardous material. In addition, to properly characterize the transaction, it is helpful to look at the intent of Quemetco, as a party to the arrangement with Ace. A reasonable inference is that Quemetco intended the arrangement with Ace to be for a bona fide sale, rather than an effort to assist Ace in disposing of or treating hazardous materials. As mentioned above, Quemetco obtained spent batteries first, then it solicited Ace's services for breaking the batteries. Under the agreement, Quemetco provided Ace with a number of used batteries proportional to the amount of lead plates it desired in return. Moreover, Quemetco sought out Ace's services so it could use recovered lead plates, a less expensive alternative to purchasing newly-mined lead. None of these facts are consistent with a finding that Ace was disposing of lead plates with Quemetco.

The more reasonable inference is that Ace intended its activity to be a bona fide business transaction involving a useful product, rather than an arrangement for the disposal or treatment of lead plates. The Court finds that the intent of both parties to the transaction was for it to be a bona fide transaction of a useful product. However, this Court must also rule out the possibility that the product was not in fact useful. Although a defendant may intend to transfer a useful product, when the product contains a hazardous substance, the court must determine whether it is commercially viable. The useful product defense, asserted by Ace requires the court to further examine the transaction to determine whether Ace's intent to sell a useful product was actually fulfilled.

### 3. Useful Product

The useful product defense requires careful scrutiny of whether the hazardous substance, here lead plates, was truly a useful product. As with the elements of intent, there is some disagreement among the courts about what constitutes usefulness. A few courts narrow the application of the useful product defense only to those products which may still be used for their originally-intended purpose. *See Ekotek Site PRP Comm. v. Self,* 881 F.Supp. 1516, 1526 (D.Utah 1995) (used motor oil is not a useful product); *Chesapeake and Potomac Tel. v. Peck Iron & Metal,* 814 F.Supp. 1269, 1275 (E.D.Va.1992) (spent car batteries are not useful products). In those jurisdictions, when the transaction involves the sale of by-products, materials used up or exhausted in their original form, the useful product defense would be inapplicable.

However, the majority of courts refer to the useful product defense without reference to original use. Although many of the cases involve products still usable as originally intended, the courts do not explicitly require original use. Instead, these courts use a balancing test to determine whether a transaction was intended to discard hazardous substances or to sell valuable materials (not necessarily still fit for their original use). In performing the test, the courts have identified several factors to be weighed, including: "the intent of the parties to the contract as to whether the materials were to be reused entirely or reclaimed and then reused; the value of the materials sold; the usefulness of the materials in the condition in which they were sold, and the state of the product at the time of transferral (was the hazardous material contained or leaking/loose)." *Pneumo,* 142 F.3d at 775 (4th Cir.1998); *see also AM Int'l Inc. v. International Forging Equip. Corp.,* 982 F.2d 989, 999 (6th Cir.1993) (focused on the value and usefulness of the product and the intent of the parties); *Florida Power & Light Co. v. Allis Chalmers Corp.,* 893 F.2d 1313, 1317 (11th Cir.1990) (focus on intent and the value of the product); *Petersen,* 806 F.Supp. at 1354 (focus on the type of agreement, the usefulness of product and intent to use product entirely as sold).

■ Because of the trend within this circuit as well as others, of using a broader definition of useful product, this Court chooses to do so as well. The Southern District of Indiana has expressed this broader view in *U.S. v. Wedzeb,* when discussing a product's worth. 844 F.Supp. 1328, 1335–36 (S.D.Ind.1994). The *Wedzeb* court found it difficult to apply the useful product exception to a transaction merely because the capacitors containing PCB's, sold by the defendants, were unused and functional at the time of sale. " 'Functionality' and 'worth' are distinct notions … it is the worthlessness of an object that makes it 'refuse' or 'garbage', which is a required characteristic of 'hazardous waste'." *Id.* at 1335. "This Court is satisfied that the marketplace provides a rea-

sonable, objective gauge of product worth. Selling a useful, marketable product that is not destined to enter the environment, as for example through application, dumping, or spilling on the land, etc., does not constitute 'disposal' under the Act." *Id.* at 1336. After focusing on the worth of the product, the court found that consumer demand for the capacitors was "sufficient to lift them out of any classification as 'waste' or 'refuse'." *Id.*

■ By its decision in *Wedzeb,* this Court has already demonstrated that it will not limit the useful product defense to original intended use. In fact, as the *Wedzeb* decision explains, such a limited analysis would possibly exempt from liability the sale of worthless products simply because they have not been used up in their original form. *Id.* at 1335. Thus, this Court will use the more appropriate analysis of usefulness that involves looking at the product's marketability and the consumer demand for the good, in addition to its functionality. The question therefore, is not whether the lead plates were still useful as originally intended, but whether they were a commercially-valuable product at the time of sale. For the reasons that follow, this Court finds that the sale of the lead plates retrieved from the spent batteries would be the sale of a commercially-valuable product.

Once they are retrieved from the battery casing, the lead plates constitute a useful product because of their worth as a source of secondary lead. Evidence of that worth is found in Quemetco's willingness to pay Ace for the lead plates. It is also found in the fact that not only are the lead plates not a by-product of Ace's business operation, Ace exists to break batteries and to sell the lead components within. For these reasons, the Court cannot agree with RSR/Quemetco that this case is analogous to one in which the defendant merely sells used batteries. In that case, the transaction is readily discernable as an arrangement for disposal or treatment, un-

like the transaction between Ace and Quemetco.

It is instructive to examine how the Fourth Circuit applied the balancing approach in *Pneumo*, a case factually similar to this one, in which the court held that the defendant was not liable under CERCLA for clean-up costs. *Pneumo*, 142 F.3d at 776. In *Pneumo*, the defendant-appellant (a railway company) contracted with the plaintiff, a railroad parts foundry operator ("Foundry"), to ship its used wheel bearings to the Foundry for processing into new wheel bearings. *Id.* at 773. Under the contract, the railway company shipped its used wheel bearings to the Foundry, which heated them to "sweat off" the dirt, grease, and impurities, so that the metals could be used to create new wheel bearings. *Id.* The railway company received credit for the weight of the used wheel bearings against the purchase of new bearings, after a deduction for the weight of the dirt and grease. *Id.* Applying the factors for determining whether a transaction was for a useful product or an arrangement for disposal, the court held that the agreements between the railroad company and the Foundry were not transactions for disposal:

> The used wheel bearings transported to the Foundry were dirty and broken when they arrived. Moreover, the bearings were melted down in a process which produced both dust and slag ... The intent of both parties to the transaction was that the wheel bearings would be reused in their entirety in the creation of new wheel bearings. The Foundry paid the appellants for the bearings; the appellants did not pay the Foundry to dispose of unwanted metal ... The parties contemplated that the bearings were a valuable product for which the Foundry paid a competitive price.

*Id.* at 775–76.

Similar balancing approaches were applied in a series of cases related to transactions involving spent car batteries. The courts in those cases, however, found that the defendants were liable for arranging for disposal or treatment of a hazardous substance. *See e.g. Catellus Dev. Corp. v. United States*, 34 F.3d 748, 753 (9th Cir. 1994) (defendant found liable for disposal of spent batteries, which constituted waste); *Gould Inc. v. A & M Battery & Tire Service*, 933 F.Supp. 431, 436–37 (M.D.Pa.1996) (defendants found liable for clean-up costs of battery-breaking site to which they sold used batteries); *Chatham*, 858 F.Supp. at 1143 (same); *Chesapeake*, 814 F.Supp. at 1275–75 (defendant who collected used batteries and sold to battery breaker held liable for clean-up costs of battery-breaking site). In each case, the courts found that the defendant was a responsible party for arranging for the disposal of used batteries to lead reclaimers.

The *Catellus* case illustrates how courts reach this conclusion. The defendant in *Catellus*, ("General") operated an auto parts store that received used batteries from its customers as trade-ins. *Catellus*, 34 F.3d at 749. General then sold the used batteries to a battery-cracking plant which extracted and smelted the lead. *Id.* The waste from the process, including battery casings, was dumped on Catellus's property. *Id.* at 750. Catellus sought clean-up costs from General under CERCLA for arranging for the disposal or treatment of a hazardous substance. *Id.* The court required that in order to find CERCLA liability, the spent batteries had to be characterized as waste. *Id.* It held that "General cannot escape having the battery casings defined as a discarded material simply by selling the battery to another party who then disposed of the casings." *Id.* The court found General liable for clean-up costs.

RSR/Quemetco argues that these spent battery cases are analogous to the case at hand, meaning Ace should be found liable. That argument fails. There is a key factual distinction between the defendants in the cited cases and Ace, which tips the balance away from finding Ace liable. Ace

was not in the business of selling used batteries to reclaimers, nor were used batteries a by-product of Ace's business. Instead, Ace was in the business of salvaging used batteries. Ace's principle business operation was to break used batteries and remove the viable lead plates from within. It was the lead plates, not the used batteries, that were delivered to the Avanti site. This distinction is crucial to the useful product defense and for distinguishing between persons who sell a used product to dispose of it, and those whose sale is their main profit-making venture.

Nevertheless, the spent battery cases listed above provide guidance in the present case. In dicta, the courts revealed a tendency to view transactions involving the sale of lead plates as distinguishable from the sale of used batteries, suggesting the former transactions may not incur CERCLA liability. The *Catellus* court, in holding that whole spent batteries were solid waste stated,[A]n inescapable fact is that leftover battery casings must be disposed of. The battery casings ... *unlike the lead plates within the casings,* ... retained their character as waste throughout and would have to be 'gotten rid of' either by General, which could have cracked the batteries itself before selling the scrap lead, or as was the case here, by [reclaimer] after it bought the entire battery. 34 F.3d at 752 (emphasis added). The Ninth Circuit appears to be drawing a distinction between a defendant who sells whole spent batteries and one who sells the lead plates from within. A similar distinction was made by the *Douglas County* court, which noted, "in selling whole spent batteries, the seller is merely getting rid of a product which has no use except to reclaim the lead inside." *Douglas County* 871 F.Supp. at 1247.

The Seventh Circuit case, *G.J. Leasing,* sheds more light on the *Catellus* holding. 54 F.3d at 384–85. *G.J. Leasing* identified *Catellus* as a mixed-motives case, "where the seller's goal was both to get rid of wastes and to make a bona fide sale of a commercially valuable property." 54 F.3d at 384. It was consideration of the seller's goal that resulted in the *Catellus* decision to impose liability, the *G.J. Leasing* court noted. "In *Catellus,* it was inevitable that at the end there would be lead-containing, hence contaminating, battery casings to discard." *Id.* at 385. The Seventh Circuit distinguished the *Catellus* decision as applying to situations in which the defendant was aware that the product it sold (e.g. spent batteries), would produce hazardous waste (e.g. battery casings) to be discarded. *Id.* at 384–85.

Here, the facts surrounding the transaction are distinguishable from cases like *Catellus* where the defendant was found liable for selling used batteries. Ace was not in the business of selling used batteries. Rather, its principle business activity was the selling of lead plates it had reclaimed from spent batteries. By applying its own labor and equipment, Ace made the lead plates more valuable as a direct source of reusable lead. The battery casings were discarded at Ace's facility prior to the delivery of the reclaimed lead plates to the Avanti site and therefore they are not at issue in this case. Although Ace may face liability for contamination at its own site due to disposal of waste from battery casings, it is not liable for contamination from the delivery of reclaimed lead plates.

Moreover, the *Catellus* court clearly limited its holding to sellers of spent batteries and noted it would not apply to one in Ace's position, who sells a productive good. "[D]isposal refers only to an affirmative act of discarding a substance as waste, and not to the productive use of the substance." *Catellus,* 34 F.3d at 750; *see also 3550 3550 Stevens Creek Associates v. Barclays Bank,* 915 F.2d 1355, 1362 (9th Cir. 1990) (referring to "products that were produced as the producer's principal business product, not by-products that the producer had to get rid of"). "Materials are not solid waste when they can be shown to be recycled by being ... used or reused as ingredients in an industrial process to make a product, provided that the materi-

als are not being reclaimed." *Catellus*, 34 F.3d at 752, (*citing* 40 C.F.R. § 261.2(e) (1993) (regulations defining solid waste)). "A material is 'reclaimed' if it is processed to recover a usable product, or if it is regenerated. Examples are recovery of lead values from spent batteries." 40 C.F.R. § 261.1(c)(4) (1993). Consequently, the seller transferring spent batteries to Ace is discarding them as waste from which Ace may reclaim a usable product.

Unlike the *Catellus* line of cases, the *Douglas County*, case is factually on point with this case. 871 F.Supp. 1242 (D.Neb. 1994). The defendant in *Douglas County*, Madewell & Madewell, Inc. ("Madewell"), sold lead plates reclaimed from spent lead-acid batteries to a secondary smelter operation. *Id.* at 1243–44. The secondary smelter ("Gould") sought to recover from Madewell the costs of clean-up for the smelter site. *Id.* Madewell received shipments of spent batteries, which it broke to remove sulphuric acid and lead plates within. *Id.* It then sold the plates at the market price to manufacturing companies to be used in lieu of lead ore. *Id.* at 1243–44. The court held that "Madewell's reclamation and sale of lead plates to Gould did not constitute an 'arrangement for disposal' and therefore, Madewell is not a 'responsible person' subject to liability under CERCLA." *Id.* at 1247.

*Douglas County* identified several factors that supported its conclusion. First, the recovery and sale of lead plates constituted Madewell's principle business product. *Id.* Secondly, Madewell, acting as a reclaimer, created a new and useful product. *Id.* Finally, Madewell sold its lead plates at the market price for lead and with the intent of making a profit. *Id.* These factors led the court to find that Madewell, and similar businesses, did not fit within CERCLA's category of arranger liability. By demonstrating these factors, a party proves that it is conducting a business venture, not attempting to dispose of or treat leftover, used materials.

Just like in *Douglas County*, Ace's principle business product is the reclaimed lead plates, and its principal business activity is to create a new and useful product. This reclamation process occurred before the transaction in question. Ace sold the reclaimed lead plates to Quemetco, for a price that reflected the market value of reusable lead. Quemetco was a secondary smelter operator, and it now seeks to recover from Ace the clean-up costs of the smelter site, just as Gould had done in *Douglas County*. Finally, like Madewell, the fact that Ace contracted for and sold the lead plates to Quemetco based on the market value of lead, indicates it was a bona fide sale of a useful product. Therefore, this Court reaches the same conclusion as the *Douglas County* court, that Ace did not arrange for the disposal or treatment of the lead plates and is therefore not a responsible person under CERCLA.

Thus, as revealed above, courts distinguish between the process of transferring used batteries, and the process of reclaiming lead plates from the batteries to recycle the usable lead. Ace, as a battery breaker, has already reclaimed the lead plates from used batteries. Yet that reclamation process is not the process alleged to have caused the pollution in this case. Instead, the accused process involves the subsequent use of reclaimed lead plates by the secondary smelter after the transfer from Ace. Therefore, the question is whether Ace's sale of the reclaimed lead plates was intended to be for disposal or treatment, or for further industrial use of a valuable product. This Court finds that Ace intended the subsequent transfer of reclaimed lead plates to be the sale of a useful product. Otherwise, if Ace were merely arranging for disposal or treatment of lead plates, its business operation would make little sense. Once lead plates have been reclaimed from spent batteries, they become a new, reusable product. Therefore, Ace's delivery of the reclaimed lead plates, under its contract with Quemetco, does not amount to an arrangement for disposal or treatment of a hazardous sub-

stance. It was the sale of a useful product.

Finally, Ace's sale of reclaimed lead plates to Quemetco was a bona fide transaction. Unlike in *Catellus*, the lead plates were not a by-product of Ace's operations. Ace was not forced to get rid of the plates as a by-product of its real business objective. On the contrary, reclaiming lead plates was the objective of Ace's business operations. The courts addressing the sale of whole spent batteries, have not broadened their holdings to encompass a defendant in Ace's position.

## IV. CONCLUSION

In conclusion, the Court finds the necessary factors to prove a defendant's sale of a hazardous substance was of a useful product and not an arrangement for its disposal or treatment, were met by Ace. The Court has examined both the intent of the parties to the transaction, and whether the product sold has a productive use. The analysis included assessing the worth of the product, i.e. its commercial viability; whether the product was a by-product of the defendant's principal business operation; the usefulness of the product as sold; and the motivation behind the sale. The Court is satisfied that the elements of the useful product defense were met.

Both RSR/Quemetco and Ace agree that this issue is appropriate for summary judgment. Therefore, this Court concludes that as a matter of law, Ace's sale of lead plates to Quemetco was not an arrangement for disposal or treatment pursuant to 42 U.S.C. § 9607(3). As a result, Ace is not a responsible person subject to CERCLA liability. Ace's motion for summary judgment is **GRANTED**. RSR/Quemetco's motion for summary judgment is **DENIED**.